Froessel, J.
Shortly after midnight on August 30, 1959, a small group of unarmed teenagers were brutally assaulted by a gang of approximately 15 young men as the former were sitting in a public playground near their homes. During the course of the wholly unprovoked assault, three boys were viciously stabbed by appellant Agron. Two of the victims, Young and Krzesinski, died as a result of the extremely deep stab wounds which Agron inflicted with his long, sharp knife or dagger. The third boy, Riemer, suffered a severe but not fatal wound of the stomach.
On September 21, 1959 the Grand Jury returned an indictment charging, in common-law form, appellants Agron and Hernandez, as well as five others, with two counts of murder in the first degree and one count of attempted murder. Following a lengthy trial, appellants were each convicted of two counts of murder in the first degree and sentenced to death. It is from these judgments of conviction that the present appeals have been taken. Appellants’ convictions of attempted murder, as well as the convictions of their codefendants for lesser degrees of homicide, are not presently before us.
It is undisputed that appellant Agron did the actual stabbings which resulted in the death of the two boys, and the prosecution proved his personal premeditated intent to kill beyond any reasonable doubt by an abundance of evidence—including admissions he made during the course of a 49-page statement which he voluntarily gave to the District Attorney, admitted in evidence without objection, and which he does not now challenge.
*135 There was, however, no evidence that appellant Hernandez or any of the other defendants directly contributed to the deaths of Young and' Iirzcsinski. Therefore, the prosecution, as to these defendants, proceeded upon the theory that they, together with Agron, had formed a conspiracy to kill, and thus all were equally responsible for the deaths which occurred as a direct result of and in furtherance of this alleged conspiracy to kill, even though they did not physically wield the knife.
Attempting to link Hernandez to Agron’s acts upon the theory of conspiracy, the prosecution was required to prove a separate premeditated intent to kill on the part of Hernandez (People v. Weiss, 290 N. Y. 160; People v. Emieleta, 238 N. Y. 158; People v. May, 9 A D 2d 508). The present case is unlike the felony murder cases where mere intentional participation in the underlying felony renders all of the nonkiller participants equally guilty of first degree murder (People v. Wood, 8 N Y 2d 48, 51; People v. Emieleta, supra, at p. 163; People v. May, supra). Since the record is barren of any evidence indicating that Hernandez continued in the fight with an intent to kill after having knowledge of Agron’s use of the knife to kill, his conviction must be sustained, if at all, on the theory that he was a member of a criminal conspiracy to kill (People v. Weiss, supra; People v. May, supra). This record, however, contains no such proof.
The relevant facts, which the jury was entitled to find, are briefly as follows: At approximately 8 or 9 o ’clock on the evening of August 29, 1959, appellants, their codefendants and several other boys, including one Hector Bouillerce, were gathered in a small park at 72nd Street in New York City. In the presence of the appellants, one Nestor Hernandez (not the appellant), hereinafter called Nestor, allegedly told Jose Rivera (hereinafter called Pepe)—the vine-president of a group to which appellants belonged—that some Spanish boys, including one “ Frenchie ” Cordero, had been beaten up that week by a group of Italian boys, and they (Nestor’s gang) wanted to “ get even ”. Nestor sought assistance from appellants and the others because they expected to encounter “ about four or five hundred Italian guys ganged up together ” in the vicinity of 45th Street. Pepe said he would go to his “ Captain’s ” (Rojas’) house and speak to him about it.
*136 As the group parted, Pepe said he would get a knife and a belt which he kept at Rojas’ home. At this remark, appellant Agron allegedly stated that he would carry the knife down to 45th Street and “when he got down there, that he was going to stab anybody who gets in his way The prosecution’s principal witness, Hector Bouillerce, testified that appellant Hernandez was present at the time Agron made this statement, but said nothing. Salado, another witness for the People who testified that he was present at the meeting, stated that Hernandez said, as a “ wisecrack ”, “To Ninth Avenue to burn all them guineas ”. It is not clear whether this remark came before or after Agron’s statement.
Subsequently the group went uptown to 78th Street, Agron, Pepe and Colon looking for Rojas. Upon their return, Agron was carrying a paper bag containing a long knife, and Colon was wearing a garrison belt to which there had been affixed 84 brass stud projections. Hector stated that when Agron returned with the knife he “started showing it around ” to Hernandez and the other boys. Thereafter, Agron, in the presence of the others, rolled it up in a cape which Hernandez had given him.
In his testimony before the Grand Jury—which the court refused to show to defense counsel because “ there is nothing in there contrary to what the witness has stated” — Hector said, in response to specific questions, that when Agron returned with the knife he did not say anything or show it to anyone. This testimony is clearly at variance with his trial testimony; and thus the trial court committed error here as to Hernandez (People v. Walsh, 262 N. Y. 140; People v. Rosario, 9 N Y 2d 286). In this connection, it was also error for the District Attorney to state in his summation that there were no inconsistencies between Hector’s Grand Jury testimony and his trial testimony.
Around midnight the group split up and proceeded in several smaller contingents to 45th Street where they expected to meet the large band of hostile boys. Appellants, together with Hector, Soto and Colon, arrived at the 45th Street entrance to the playground before the others. At that point, Agron was armed with his long dagger, Colon wore the garrison belt, and Hernandez carried an ordinary umbrella.
*137 The five boys entered the playground and saw two boys and a girl seated on one of the benches. Agron and Colon approached them, and then returned to their comrades stating that ‘ ‘ they could be the ones but they didn’t know”. Thereupon Soto, Colon, Hector and Hernandez left the playground and proceeded to the corner to await the arrival of their companions. Agron remained behind fearing that he might “ get picked up ” with the knife, which he had concealed in his undershirt.
Their friends arrived shortly thereafter, and the entire group of about 15 boys returned to the park. At this time, they found six or seven boys and two girls seated on benches in the playground. The latter turned out to be the two 16-year-old boys fatally stabbed and several of their friends. Agron asked these neighborhood teenagers if they had seen Frenchie, and was told by one of them that he was around the corner. Pepe and Nestor approached them, but told their companions that it was too dark to identify the boys and girls.
Krzesinski, Young, Eiemer and some of the others then decided to leave. As they were leaving, someone called out, “ No Gringoes leave the park ”. Two of the boys turned back at this command and walked over to where Hector was standing with Pepe, Nestor and Colon. Pepe then asked Nestor whether these were the boys who had beaten up his friends earlier that week, and as he said this he lit a cigarette lighter in front of their faces. Nestor said he did not know. The boys denied any knowledge of the episode referred to. At that point Soto approached and asked,1 ‘ What is the matter % Are you lying % ’ and hit one of the boys in the mouth with his fist, knocking him down. Thereafter, fighting broke out throughout the playground. Hernandez was seen standing on a side bench swinging his umbrella at a group clustered about him.
Eiemer testified that as he was about to leave he was hit on the side of the head with a square object and fell against the sliding pond. Four or five members of appellants’ group then advanced upon him, and commenced to beat him with their fists. As this was going on, Eiemer saw Agron step in and stab him just above the navel. Hernandez took no part in the assault upon Eiemer.
There was no other witness to the stabbings, and the only other record of what actually occurred in that respect comes *138 from Agron’s statement to the District Attorney. Agron told how one of his friends picked up a boy from the ground, knocked him out, picked him up again, and then Agron stabbed him in the back. His next victim was running (apparently to escape) when Agron struck him in the back. He then stabbed another boy in the front, inserting the knife all the way. There is no evidence that Hernandez saw these acts; the playground was dark.
As the boys were leaving — after the stabbings had occurred —Hernandez and one or two of the others paused momentarily to assault Orphanos and his girl friend who were sitting on a bench near the 45th Street exit. Orphanos testified that two boys held him, while Hernandez struck him in the face with hig. hand and then hit him over the head with an ordinary umbrella. Hernandez admitted this assault. The tip of Hernandez’ umbrella broke off when it hit the wall or the bench as he struck Orphanos over the head.
During their return uptown, Agron told Hector and some of the others that he had “ stabbed five people”, and upon arriving at 78th Street showed the knife to the others present. When asked why there was no blood on it, he replied “ that when it goes in fast and comes out fast, it don’t leave no blood ”. Hernandez was not present at these times but rejoined the group later.
Appellants and one or two of the other boys then went to Rojas’ apartment to hear a news bulletin concerning the events at the playground. While at the apartment, the appellants allegedly said “they was killing around four or five guys over 45th Street and Ninth Avenue ”, and when the awaited news broadcast announced that two boys had been killed, they said, ‘ ‘ A couple of Gringoes less ’ ’. According to another witness, Agron was the one who made this remark and the others all laughed. Hernandez was also alleged to have said that he hoped he stuck the umbrella in the stomach of one of the boys in the park, and that anyone calling the police would also be killed. Agron then demonstrated how he had stabbed the victims, and suggested that he become the leader because of his performance that evening.
The day after the killings, Agron confided to one Pedro (not Pepe) Rivera that, while wearing a cape, he had “ stabbed two *139 guys ” in a park in Manhattan. Hernandez was present but said nothing. Shortly after being apprehended, Agron told the police substantially the same thing.
There can be no serious dispute that the jury was presented with more than enough evidence upon which to convict Agron for his own individual acts. The evidence of his guilt is overwhelming. He does not deny that he stabbed the decedents, and makes no attempt to impugn his earlier admissions to that effect. Rather, relying upon portions of his statement to the District Attorney, Agron claims that he did not intend to kill his victims but merely sought to hurt them ‘ ‘ real bad ’ ’.
He explains the deep stab wounds (the dagger went in to the hilt) by saying that he only meant to insert half the blade (which was 7% inches long, % inch wide and % inch thick at its upper end), “ but it kept on going in ”. This, of course, does not constitute a defense, since defendant is presumed to have intended the natural and necessary consequences of his acts (People v. Schmidt, 168 N. Y. 568, 574, 576). “ The weapon used and the vital part of the body on which the blow was inflicted justified the jury in finding that the defendant intended to take life ” (People v. Schmidt, supra; People v. Emieleta, 238 N. Y. 158,162, supra).
From Agron’s description of the stabbings, related above, it is clear that he knew exactly what he was doing at the time. There was ample time for deliberation and premeditation as to each stabbing. He was not merely thrashing about wildly in an attempt to stave off an assault upon his person—rather, he quite calmly and deliberately stabbed three persons who he knew at that moment were in no position to do him any harm. He even took pains to do it in such a manner that no blood would adhere to the knife. His friends were thoroughly in command of the situation, and there is no indication that they required or requested his assistance. ‘‘ Repeated shots, blows or acts of violence point toward deliberate action” (People v. Sanducci, 195 N. Y. 361, 367-368; People v. Scott, 307 N. Y. 663).
In addition to all this, the jury had before it Agron’s statement that he would stab anyone who got in his way, his subsequent unconcealed pleasure at the result of his night’s work, and his expectation to become the leader because of it. The jury could properly evaluate Agron’s intention by reference to his *140 comment and the subsequent killings. As we noted in People v. Paige (283 N. Y. 479, 483), “ Ordinarily, where a person has said he would ‘ kill ’ another and a few days later does kill him, a finding that the homicide was committed with a deliberate, premeditated design to effect the death of the person killed, is justified by the evidence and often no other inference is possible.” And the same may be said of his subsequent statements, which are in the nature of admissions.
The jury, upon an abundance of evidence, concluded that Agron was guilty of murder in the first degree, and their verdict should not be disturbed. Neither People v. Weiss (supra) nor People v. May (supra), relied upon by appellant Agron, dictates any other result with respect to him. The significance of those cases lies in their holding regarding the nonkiller participant in an alleged conspiracy to kill. Although we also reversed the conviction of the alleged actual killer in the Weiss case, we did so because under the court’s charge the jury was prohibited from passing upon the guilt of the killer on the basis of his own acts once they concluded that there had been a conspiracy. No such restriction is found in the charge in the instant case. Indeed, the court instructed the jury at the beginning of his charge that they might find “ that one or more of the defendants are guilty of murder in the first degree ” (emphasis supplied); at the conclusion of his charge he told them what their verdict as to each defendant might be; and at the request of defense counsel the court charged that the jury might find that the acts of Agron were isolated acts, apart from a conspiracy to kill.
The evidence contained in this record, in addition to establishing Agron’s personal premeditated intent to kill, supports the finding of a conspiracy to commit assault. As to Hernandez, however, that is not enough. To sustain his conviction it must “ exclude to a moral certainty, every hypothesis ” other than that the conspiracy was one dedicated to murder (People v. Weiss, 290 N. Y. 160, 170-171, supra; People v. May, 9 A D 2d 508, 512, supra; People v. Leyra, 1 N Y 2d 199, 206; People v. Taddio, 292 N. Y. 488, 492). The evidence must not only be consistent with defendant’s guilt, it “ must be inconsistent with his innocence ” (People v. Fitzgerald, 156 N. Y. 253, 258). This it failed to be.
*141 We have examined the numerous other points raised by the appellants, and, while none presents prejudicial error, we shall briefly discuss but three of them.
(1) As to the claim that the prosecutor’s alleged fomentation of racial prejudice deprived appellants of a fair trial:
Defense counsel objected to the prosecutor’s reference to the “ American ” boys and the “ Puerto Bican or Spanish ” boys. The prosecutor replied that he knew of no other way to distinguish the two groups without thoroughly confusing the jury, and that he was merely repeating the terminology used by the witness. The court sustained the objection: “ if you can agree on some other term by which we can differentiate between one group and the other. I don’t know ” (emphasis supplied). The witness did not know either, stating: “I can’t describe them no better, something else.” Significantly, several of the defense counsel also employed these terms. While it would undoubtedly have been better to have avoided references to defendants’ nationality or ancestry where at all possible, it was not easy in the setting of this case, where references on both sides were freely made to Americans, Puerto Bicans, Italians, Irish, guineas and gringoes. In the pattern of this case, such remarks did not constitute prejudicial error.
(2) As to appellants’ claimed denial of their constitutional right to be indicted and tried by juries from which qualified persons of Puerto Bican birth or descent were not illegally and improperly excluded:
To sustain this contention, appellants were compelled to show that there had been a systematic and intentional exclusion of persons of Puerto Bican ancestry from the two panels (People v. Dessaure, 299 N. Y. 126, cert. den. 337 U. S. 949). This they failed to do. It has not been shown that any otherwise qualified person was denied the right to be on one of these panels by virtue of his Puerto Bican ancestry. Indeed, special efforts were made to obtain Puerto Bicans, and there were several persons of Puerto Bican birth listed on both the Grand Jury and Special Jury panels. Want of proportional representation of groups not proven to be deliberate and intentional is not constitutionally offensive (Fay v. New York, 332 U. S. 261, 291; Akins v. Texas, 325 U. S. 398, 403).
*142 (3) As to the claim that the trial was seriously prejudiced by newspaper, radio and television reports :
The jury was scrupulously instructed by the court to avoid any discussion of the trial, and particularly to abstain from reading or listening to any accounts thereof each time that they recessed. Indicative of the lack of merit of this contention is appellant’s (only Hernandez raises this point) failure to move for a continuance, change of venue or mistrial on this ground. In any event, appellant has not shown (a) that some or all of the jurors came in contact with any prejudicial material; or (b) that it in fact exerted an influence upon them thus depriving him of a fair and impartial trial. Absent such a showing, appellant’s point must fail (United States ex rel. Darcy v. Handy, 351 U. S. 454, 461-462; Holt v. United States, 218 U. S. 245, 251; see, also, Note, Free Press; Fair Trial—Rights in Collision, 34 N. Y. U. L. Rev. 1278, 1290-1291). This certainly is no Irvin v. Dowd (366 U. S. 717) case, where, among other things, “Bight out of the 12 [trial jurors] thought petitioner was guilty” before trial.
Accordingly, the judgment of conviction of appellant Agron should be affirmed, and the judgment of conviction of appellant Hernandez reversed and a new trial ordered.