Fuchsberg, J.
These seven defendants, Thomas Ozarowski, Russell DePasquale, Martin Miller, Marc Zakarin, Philip Benenati, Roger Santavicca, and Thomas O’Neill,[1] were all convicted of conspiracy in the third degree (Penal Law, § 105.05) for their joint participation in an act of violence which resulted in extraordinarily severe injury to their victim. Upon the basis of the conspiracy conviction, they were also convicted of two counts of assault in the second degree (Penal Law, § 120.05, subds 1, 2), three counts of possession of a dangerous weapon (Penal Law, § 265.05, subd 9, renum § 265.01, subd [2]; L 1974, ch 1041, § 3) and one count of criminal trespass in the third degree (Penal Law, § 140.10). All seven defendants were sentenced as youthful offenders (CPL art 720). Benenati and Zakarin were given probationary terms; Ozarowski, Miller, O’Neill, DePasquale and Santavicca received reformatory sentences of indeterminate length.
Among the contentions defendants raise on appeal is the assertion that the requisite specific intent to commit second- *486 degree assault was not proved against each of them. In that regard, they urge that the finding of such intent made by the trial court, in this nonjury trial, was based on uncorroborated accomplice testimony and on postconspiracy statements which should not have been admitted against all defendants.
We affirm all the convictions for the reasons which follow.
In setting them out, it will be useful to outline the skein of events leading up to the assault. On March 1 and 2 of 1971, Russell DePasquale and Chester Ozarowski, the latter not a defendant in this case, were involved in separate altercations with different employees of Nathan’s, a fast-food restaurant located in the City of Yonkers. Each had been threatened by an employee with a bared knife or similar weapon; DePasquale had thrown a garbage can at his assailant in order to make good his escape. The evidence further indicated that there existed some sort of feud between the day shift at Nathan’s and a combination of young men of which Chester Ozarowski and Russell DePasquale were a part.
On the evening of March 2, members of this group gathered at the home of defendant Miller to discuss these incidents. DePasquale was present, but Chester Ozarowski was not. His brother, defendant Thomas Ozarowski, was there. Two witnesses, Joseph Artanis and Arlette Travalini, later testified that all of the defendants who are parties to this appeal were present in the apartment, save Santavicca. Artanis was an accomplice witness; Arlette was not.
Arlette, Artanis and other witnesses swore that all the six defendants present at Miller’s apartment left there to go to Nathan’s. In the lobby of the apartment house, they met Chester Ozarowski and two others, Gerard Fitzpatrick and Thomas Capasso. Arlette described how, while they were still in the lobby, Zakarin took a baseball bat from beneath his coat and handed it to Miller. Artanis testified that there were several baseball bats lying on a sofa in the room in Miller’s apartment itself when the decision to go to Nathan’s was made. Other witnesses, whose testimony is in substance undisputed, saw bats in the possession of various defendants that night.
They headed for Nathan’s in three cars. Santavicca was picked up en route by prearrangement. Arlette was dropped off at her home. When some of the defendants arrived at the planned meeting spot in a parking lot near Nathan’s, it was discovered that one of the cars had not arrived. Some of the *487 defendants returned to check on the missing car; eventually all arrived at the appointed place. Their movements were coordinate.
Testimony as to what occurred after they reached Nathan’s is less clear. Miller apparently entered Nathan’s to provoke an incident; he ordered pizza, accepted it, and then ran out without paying for it. Nathan’s employees did not respond with either violence or threatened violence. An employee of Nathan’s so testified. Fitzpatrick, Benenati, and Capasso apparently went to a candy store nearby, found it closed, and then sat or stood near a wall from which they could see the garbage area behind Nathan’s.
At about that time, Artanis saw Selim Rabadi, an employee of Nathan’s night shift not known to defendants, exit from the rear of the restaurant pushing a garbage cart, saw Chester Ozarowski emerge from the garbage bin holding something behind his back, and then saw Chester swing a bat at Rabadi’s head. The only evidence of motivation for this act is the events already described.
Rabadi, as a result of that blow, which fractured his skull, is paralyzed on one side of his body and has lost his vision, much of his hearing, control over his bodily functions, and, to some extent, control over his emotional behavior. Nevertheless, he was able to take the stand, his doctor having testified that, within limits, he was capable of giving accurate testimony. Rabadi’s description of the attack was somewhat different from that of Artanis. He recalled that, before blacking out, a group of youths beat him from behind while one of them held him by the neck in front. His story fits with that told by defendant O’Neill.
O’Neill, who gave statements to the police favoring the prosecution, was called by the People at a preliminary hearing, during the course of which he changed his story drastically, characterizing his earlier statements as lies told to the police out of fear. On the other hand, at the trial itself, on cross-examination, his story, while still restrained, reverted to some of its original version. For instance, he there testified that, in the apartment, Thomas Ozarowski had stated that his brother Chester was planning to go to Nathan’s to "talk” to the employee who had assailed him, that Thomas had expressed the desire to go with Chester as he expected trouble, and that the entire group then indicated its desire to go with Chester for the same reason. O’Neill further testified that, *488 once the group had reached Nathan’s, he and most of the others went straight to a garbage bin in the rear of the restaurant and hid there until Rabadi arrived to dump garbage, when he, O’Neill, arose from the bin behind the others, who were also leaving it as Rabadi retreated. He heard a thud, saw the body, and ran.
Indeed, all of the defendants fled from the shopping center after the incident. Although an eyewitness, one John O’Mara, could not identify them individually, he saw the group flight. Some of the defendants later denied to police that they had ever left Miller’s apartment that evening, but others of them made detailed statements, which led police to the locations where three baseball bats had been discarded. In addition, Santavicca told a school friend, Dennis De Lango, the next day, that "We think we killed a Spic last night”. De Lango, who was not otherwise involved, so testified and thus, by evidence admissible against Santavicca (People v Peller, 291 NY 438, 443; People v Gioia, 286 App Div 528), provided the necessary corroboration for the accomplice testimony as to the role of Santavicca, who was the only defendant to have joined the others after they left the apartment.[2]
The rapid, continuous and related sequence of events on the night of the assault, the planful character of the group action, the immediacy with which their response followed the initial altercations, the fact that these were discussed at the meeting from which the adventure at Nathan’s took off, the fact that the defendants armed themselves with baseball bats in the expectation that their foes would use deadly knives, and the en masse nature of their deployment at Nathan’s were all telling circumstances which illuminated the events of the night of March 2. On the basis of all this proof it is, therefore, not surprising that the Trial Judge found the conclusion inescapable that there was a common plan or scheme hatched in Miller’s apartment that evening and that overt acts in furtherance of it took place (Penal Law, §§ 105.05, 105.20).
Accordingly, the more troubling question is not whether there was a conspiracy, but rather, what its goal was, for, in order to support a conviction of conspiracy in the third degree, *489 that goal must have been a felony (Penal Law, § 105.05). In that connection, the defendants assert that, at most, the evidence falls short of proving the element of intent required for conviction of felonious assault, arguing that the proof supports only the existence of an agreement to go to Nathan’s to provoke a "fair fight” and that the baseball bats were taken along to be used in self-defense and only if opponents used knives as weapons. The difficulty with that argument is twofold. First, its emphasis on the form rather than the substance of the agreement between the defendants, does not alter its essentially factual character, whose determination adversely to defendants now stands affirmed by the Appellate Division. Second, the claim that the bats were taken along only for self-defense, a matter subject too to assessment for credibility, ignores subdivision 1 of section 35.15 of the Penal Law, which limits such a defense to situations in which defendants do not act as provocateurs.
However, that still leaves open the determination of whether the specific intent proved here supported the particular felonies towards which the indictment charges the conspiracy was directed. The People here were required to prove intent to commit the specific crimes charged against each of the defendants. Intent, like any other element of a crime, may be proved by circumstantial evidence. (People v Agron, 10 NY2d 130, 140; People v Weiss, 290 NY 160; People v May, 9 AD2d 508, 512; People v Leyra, 1 NY2d 199, 206; People v Taddio, 292 NY 488, 492.)
The inference of intent under the conspiracy doctrine presents special problems, however. As the United States Supreme Court has recently noted: "[W]e scrutinize the record for evidence of such intent with special care in a conspiracy case for, as we have indicated in a related context, 'charges of conspiracy are not to be made out by piling inference upon inference, thus fashioning ... a dragnet to draw in all substantive crimes.’ Direct Sales Co. v. United States, 319 U. S. 703, 711 (1943). See also Ingram v. United States, 360 U. S. 672, 680 (1959).” (Anderson v United States, 417 US 211, 224.)
Our own case law supports this principle. In distinguishing the conspiracy case from the ordinary case in which a defendant’s own intent may be inferred from his actions, we stated: "Attempting to link Hernandez to Agron’s acts upon the theory of conspiracy, the prosecution was required to prove a separate premeditated intent to kill on the part of Hernandez *490 (People v. Weiss, 290 N. Y. 160; People v. Emieleta, 238 N. Y. 158; People v. May, 9 A D 2d 508). The present case is unlike the felony murder cases where mere intentional participation in the underlying felony renders all of the nonkiller participants equally guilty of first degree murder (People v. Wood, 8 N. Y. 2d 48, 51; People v. Emieleta, supra, at p. 163; People v. May, supra).” (People v Agron, 10 NY2d 130, 135, supra.)
In the Agron case, the evidence as to whether defendant Hernandez knew of Agron’s possession of a knife on the night in question was conflicting. We therefore refused to affirm Hernandez’ conviction on a conspiracy theory, since the facts which were used to show his intent did not exclude to a moral certainty all other possible conclusions (p 140). We did, however, sustain the conviction of defendant Agron, noting that his contention that he had only meant to injure and not to kill was of no avail: "This, of course, does not constitute a defense, since defendant is presumed to have intended the natural and necessary consequences of his acts (People v. Schmidt, 168 N. Y. 568, 574, 576). 'The weapon used and the vital part of the body on which the blow was inflicted justified the jury in finding that the defendant intended to take life.’ (People v. Schmidt, supra; People v. Emieleta, 238 N. Y. 158, 162, supra). ” (People v Agron, supra, 139.)
And we said in People v Weiss (290 NY 160, 171, supra): "The court charged that if Epstein and Weiss knew that Simmons had a dangerous weapon and it was their understanding that Simmons was merely to assault Leder with it, they would be responsible for the normal and necessary consequences of his act and it would not lie in their mouths to say that they had intended to have Leder assaulted and beaten with the weapon but that they did not intend to have him killed. That charge constituted a serious error of law”. (Emphasis added.)
What this sequence of legal propositions establishes is that, while the ultimate act of violence may be used by the trier of facts in making the inference of intent as to the defendant who actually struck the blow, that act is not determinative of the intent of the other conspirators. Thus, in the case before us, the question is not what Chester Ozarowski intended when he hit Selim Rabadi a crushing blow to the head, but rather whether Chester’s act was one intended by all of the others and one performed in furtherance of the conspiracy. While the nature of the blow is useful in imputing intent to do serious *491 injury to Chester, it may not be used to infer such intent on the part of the others.
Therefore, in order to uphold the convictions here on both the first and second counts of assault in the second degree (Penal Law, § 120.05, subds 1, 2), the court below was required to find from the evidence of the conspiracy itself that each defendant had the specific intent to do "serious physical injury” as well as the intent to do "physical injury” by means of a dangerous instrument[3] (Penal Law, § 10.00, subds 9, 10, respectively, define those terms; see Matter of Taylor, 62 Misc 2d 529; People v Rumaner, 45 AD2d 290; Practice Commentary, McKinney’s Cons Laws of NY, Book 39, Penal Law, § 120.05, subd 2, p 342; cf. Penal Law of 1909, § 242, subd 4; People v Katz, 290 NY 361; People v Osinski, 281 NY 129; People v Ball, 283 App Div 285).
We think that the court below, sitting as the trier of the facts, was entitled to decide that each defendant formed the specific intent that one or more of their number should do such serious injury during the planned fight. Unlike the situation in the Agron case, there was here no doubt that all defendants knew Chester had a bat; indeed several of them had bats. These were not secreted from one another, but openly displayed and taken along in the presence of all. The surrounding circumstances make perfectly clear that a baseball game was not what the gang had in mind. Nor was their intent, any more than were its consequences, of any different character because those who shared it were youths rather than adults. It only requires, in addition, that it be logical to assume, on the basis of this concerted effort to start a fight while armed with bats, that nothing less than serious injury was intended. The court below concluded that this was the case, and we see no reason to disturb its conclusions.
On both the conspiracy and intent issues, as to each of the defendants, we further note that corroboration of an accomplice need not extend to every detail of such testimony; it is *492 sufficient if it tends to connect each defendant with the crime (People v Daniels, 37 NY2d 624, 630, and cases cited therein; CPL 60.22, subd 1). By that standard, accomplice witnesses O’Neill, Fitzpatrick, and Artanis were more than amply corroborated, among other things, by the testimony of Arlette Travalini and Selim Rabadi.
We also note that one of the defendants, Benenati, raises one question different from those urged by his fellow defendants, i.e., renunciation. In doing so, he relies on the fact that, after arriving at the . shopping center, he wandered off with Fitzpatrick and Thomas Capasso in search of a candy store, although we note that he returned with them to their perch overlooking the garbage area of Nathan’s, which was the arena of the assault. Renunciation requires more than merely withdrawal from a conspiracy. It is an affirmative defense, and there must be a demonstration, inter alia, that a "substantial effort” was made to "prevent the commission” of the conspiratorial plan. (Penal Law, § 40.10, subd 1.) Since Benenati indisputably was present in the apartment where and when the conspiracy was formed, it appears difficult to question the finding that the defense has not been sustained.
Finally, the opinion of the trial court, fairly read, reveals that, while it utilized some details from postconspiratorial statements made by certain defendants to better present the issues arising from the checkerboard of facts here in perspective, in its legal analysis, it relied only on the relevant evidence in determining the guilt or innocence of each defendant.
Nor was the trial court’s sentencing of the defendants as youthful offenders violative of their constitutional rights. Although article 75 of the Penal Law, pursuant to which it acted, has been repealed since the sentencing (L 1974, ch 652, as amd by L 1974, ch 653, § 7), its repeal did not affect sentences already imposed. (L 1974, ch 653, § 10.) While the constitutionality of article 75 has been called into question by at least one court on equal protection grounds (United States ex rel. Sero v Preiser, 506 F2d 1115, cert den 421 US 921; cf. People v Daniel J. S, 48 AD2d 665), that holding dealt exclusively with longer sentences mandated for youths than for adults on convictions of misdemeanors. The defendants here were punished far less severely than if they had been sentenced as adults for the same felonies of which they were found guilty. (CPL art 720.)
*493 Accordingly, the order of the Appellate Division should be affirmed.
Chief Judge Breitel and Judges Jasen, Gabrielli, Jones, Wachtler and Cooke concur.
Order affirmed.

. An eighth defendant, Richard Strome, has not appealed. Others who were charged with participation in the alleged conspiracy were tried separately.

. The evidence indicates that the plan was complete when the group left the apartment, and Santavicca joined in it when he arrived, ratifying, in effect, its purposes and acts. (Samara v United States, 263 F 12, 15-16; Lile v United States, 264 F2d 278, 281; People v Arnstein, 157 App Div 766, 770; People v Sher, 68 Misc 2d 917, 926.)

. The Penal Law defines a dangerous instrument as "any instrument, article or substance * * * which, under the circumstances in which it is used, attempted to be used or threatened to be used, is readily capable of causing death or other serious physical injury.” (Penal Law, § 10.00, subd 13.) Clearly, under the circumstances here, a baseball bat qualifies as such a dangerous instrument. (See People v Rumaner, 45 AD2d 290, supra.) It is too obvious to need elaboration that when used outside its sports context, it is a dangerous instrument of the very type recognized as an effective weapon since primitive times.