Jasen, J.
Appellant David Parks was found guilty by a jury of the crimes of rape in the third degree and endangering the welfare of a child. The Appellate Division affirmed the judgment of conviction, without opinion. On appeal to our court, appellant argues that the petit jury which convicted him was unconstitutionally selected and that the trial court erred in permitting the mentally retarded complainant to testify under oath. An important corollary issue is whether, in assessing the complainant’s testimony, the jury was properly permitted to consider the testimony of her school teacher as to the nature and degree of her mental impairment. We conclude that, under the circumstances presented, the right to trial by jury was not infringed and that acceptance of both complainant’s testimony, and that of her teacher, was not an abuse of discretion. We would, therefore, affirm the order of the Appellate Division.
On June 30, 1974, the complaining witness, then 16 years old and under the statutory age of consent, was admitted to a Long Island hospital. She had been hemorrhaging for a four-day period in the aftermath of an incomplete abortion. While in the hospital, the complainant gave a statement to a policewoman. Based on the information thus received, two Nassau County police detectives went to the home of David Parks. Defendant was informed that the police were conducting an investigation and he voluntarily agreed to accompany them to the station house. Defendant was brought into a squad room and given the now standard preinterrogation warnings. (Miranda v Arizona, 384 US 436.) After being advised of the nature of the investigation, he denied having had intercourse with the complainant. The officers then explained to him that they had a complaint that they would present to the Grand Jury, that it was possible that he would be indicted for rape, that if defendant gave the police a statement he would be arrested but that he would have an opportunity to explain his version of the events to the Grand Jury. Defendant replied that he knew that the girl would get him into trouble and, *38 further, that he knew that she was under the age of consent. Defendant agreed to provide the police with a written statement. On the basis of further conversations with the defendant, a police officer prepared a typewritten statement which was subsequently read and signed by the defendant.
In the statement, defendant set forth his age (43), his place of residence, his telephone number and his place of employment. After acknowledging that he had been advised of his various constitutional rights, he admitted committing three separate acts of intercourse with the complainant between December, 1973 and March, 1974. Defendant was employed by a bus companjr and knew the complainant as one of the children he drove to a special work program conducted by the Board of Cooperative Educational Services (BOCES). In the statement, defendant maintained that each of the acts of intercourse resulted from the persistent sexual advances of the complainaing witness.
On August 16, 1974, defendant voluntarily appeared before the Nassau County Grand Jury. He testified that he had intercourse with complainant on two occasions and gave detailed accounts of both incidents. The import of this testimony was that the sexual contact was originated by the complaining witness and her advances eventually weakened his own moral inhibitions. Defendant was indicted on two counts of rape in the third degree and two counts of endangering the welfare of a child. After conducting a pretrial hearing, the trial court found that the typewritten statement given by defendant to the police had been voluntarily made and a motion to suppress the statement was denied.
The trial was scheduled to commence on January 28, 1975. On that day, counsel for defendant made an oral motion to dismiss the jury panel on the ground that it was selected in violation of the defendant’s constitutional rights. Counsel argued that former subdivision 7 of section 599 of the Judiciary Law, granting to women an automatic exemption from jury service, was in direct conflict with Taylor v Louisiana (419 US 522), decided by the Supreme Court of the United States seven days earlier. The court denied the motion, relying upon a memorandum it had received from the Administrative Judge. In a portion of this memorandum, read into the record without objection, it was stated that: "In Nassau, according to figures supplied by the Commissioner of Jurors, 33 per cent of those available to be selected to serve and *39 actually present as respective [sic] jurors in the central jury room on any given Monday are women. Thus, in Nassau County, women are not for all practical purposes to be excluded from jury service.”
After a luncheon recess, the selection of a trial jury commenced. In accordance with standard New York procedure (see CPL 270.05, 270.15), 12 prospective jurors were summoned to the jury box. Of these 12, 5 were female. Three were challenged peremptorily by the defense. As jury selection proceeded, the defense challenged three more women peremptorily. Ultimately, a jury of nine men and three women was selected.[1]
At the trial, the prosecution called, as its first witness, a teacher who had known the complaining witness for approximately five and a half years and who had taught the complainant for the past two and a half years. Over objection, the teacher testified that the complainant had an intelligence quotient of 73 and, academically, was functioning on a fifth grade level. Although the complainant had a chronological age of 16, her mental development approximated that of a 12- or 13-year-old child. The teacher also stated, in response to a question regarding the type of personality the complainant had, that the complainant "is very quiet in classes, a loner, she doesn’t bother with the other students very much. Doesn’t have very many friends in class or at school.”
After the completion of the teacher’s testimony, the People called the complainant to the witness stand. Based upon the testimony indicating that the complainant was mentally retarded, the court, at the request of defense counsel, conducted a hearing, out of the presence of the jury, to ascertain whether the complainant was competent to testify. In response to questions from the court, the complainant twice stated that she knew what it means to tell the truth and promised that, if she was sworn to tell the truth, she would tell the truth as to what had happened. On the other hand, *40 she was unable to state what would happen if the truth was not told and could not state the difference between telling the truth and telling a lie. At first, she could not recall why she was in court. She remembered speaking to an Assistant District Attorney about what happened in the past year. She stated that she knew the defendant David Parks. She did not respond to several of the questions put to her by the court. At the conclusion of its examination, the court found that the complainant was competent to be given an oath.
After being sworn, the complainant testified that she first met the defendant on the school bus and became friendly with him. She stated that, on two occasions in the winter, defendant wanted to have intercourse with her and did have intercourse with her. The record reflects that there were long pauses between several of the questions by the prosecutor and the response by the complaining witness. On cross-examination, the witness recalled testifying truthfully before the Grand Jury and stated that she knew the difference between the truth and a lie, although she was unable to state the difference. She maintained that she had told the truth on her direct examination, but admitted at one point that she did not recall everything that had happened between herself and David Parks. Although she stated that she knew what was meant by the terms "rape” and "intercourse”, she was unable to provide an explanation. Later in her testimony, she said that she did not know the meaning of the term intercourse and that she first heard the word used by the policewoman who talked with her in the hospital. At the conclusion of her testimony, she was unable to state what the term rape means.
The balance of the People’s case consisted of testimony by complainant’s mother as to complainant’s date of birth and age, the testimony of a police detective regarding the typewritten statement, and the reading of defendant’s Grand Jury testimony. The defendant did not offer any witnesses or evidence. The jury found the defendant guilty on all counts of the indictment.
At the threshold, there is a question as to whether defendant’s challenge to the jury panel was properly presented to the trial court and, thereby, preserved for appellate review. GPL 270.10 provides that a challenge to a jury panel must be made "in writing” before selection of the jury proceeds. We have recently held that an oral motion made before selection of the jury was ineffective to preserve a challenge to the *41 panel, even though written notice was subsequently given after the jury had been selected and the trial court was willing to consider the motion on the merits. (People v Consolazio, 40 NY2d 446, 455.) Here, the suppression hearing, the jury selection, and the trial were all completed on a single day, January 28, 1975. Immediately before jury selection commenced, counsel for the defendant made an oral challenge to the jury panel. “First of all, your Honor, I apologize to the Court. This particular motion is not on paper. My understanding was the date for this case was February 7th. I was notified yesterday that the case was to begin today.” The court replied that “[w]ell, we will waive that formality.”
We believe that, under the unique circumstances of this case, the trial court had the authority to “waive” the formality of a writing and that the issue of defendant’s challenge to the jury panel was preserved for appellate review. It should be recognized that, generally, the absence of a written challenge presents a serious difficulty. (See People v Petrea, 30 Hun 98, 103, affd 92 NY 128.) The evident purpose of the writing requirement is to ensure that the District Attorney and the court have sufficient time to prepare for hearing to resolve disputed issues of fact and law. For this reason, the written challenge must specify “the facts constituting the ground of challenge.” (CPL 270.10, subd 2.) The need for a written notice is obviated where the necessary parties have been apprised of the specific grounds of objection well in advance of jury selection. That the court was expecting defendant’s challenge to the jury panel on the ground that women were excluded from participation is established by the fact that the court immediately produced a memorandum on this topic from the Administrative Judge. Most notably, the prosecution did not object to consideration of the objection on its merits and the People do not now argue that the issue was not preserved for our review. The requirement of a written detailed notice is designed to prevent the unfair surprise inherent in springing an oral motion upon the prosecutor and the court on the eve of jury selection. Where it appears that the parties did have advance notice and there is no claim of surprise or prejudice, the requirement of a written notice becomes a formality that may be waived by the court, in its discretion.
Defendant bases his challenge to the jury panel upon the assertion that the procedure which governed the drawing of the panel conflicts with the Supreme Court’s decision in *42 Taylor v Louisiana (419 US 522, supra). Historically, New York has granted, as a matter of public policy, persons in a number of categories exemptions from jury service. Beneficiaries of exemptions have included, among others, the clergy, physicians, attorneys, members of the armed services, policemen, parents responsible for the care and supervision of minor children, the elderly, and, the category disputed here, women. (Judiciary Law, §§ 507, 599.) Qualified jurors could exercise their statutory exemptions after being summoned for jury service and, in most cases, if the exemption was not then asserted it was waived. (Judiciary Law, §§ 528, 600.) Women, however, were accorded the right to assert their exemptions at any subsequent time. (Judiciary Law, § 600.) In Taylor v Louisiana (supra), the Supreme Court declared unconstitutional provisions of Louisiana law which prevented a woman from being selected for jury service unless she had previously filed with the clerk of the court a written declaration of her desire to be subject to jury service. Within two weeks of the Taylor decision, the Legislature, fearing that the women’s exemption provisions would be declared unconstitutional, repealed the women’s exemption provisions. (L 1975, ch 4, eff Feb. 5, 1975; see Governor’s Memorandum of Approval, 1975 McKinney’s Session Laws of NY, p 1731.) Defendant’s trial was held in the brief period between the rendition of the Taylor decision and the repeal of the pertinent Judiciary Law provisions.
While a criminal defendant in the State courts has a constitutional right, by virtue of the Sixth and Fourteenth Amendments to the Federal Constitution, to be tried by a jury that is truly representative of the community (Peters v Kiff, 407 US 493, 500; Duncan v Louisiana, 391 US 145), the States have a wide discretion in formulating procedures for the selection of juries, provided that the source from which juries are derived "reasonably reflects a cross-section of the population suitable in character and intelligence for that civic duty.” (Taylor v Louisiana, 419 US, at p 528; Brown v Allen, 344 US 443, 474.) Our democratic heritage, as well as the need for confidence in the fairness of the criminal justice system, requires that all segments of the community participate in the administration of justice. Hence, the deliberate exclusion of a particular community group or class of persons from jury service violates the constitutional right to a jury trial. (Taylor v Louisiana, 419 US 522, 530, supra.)
*43 On the other hand, it is equally well established that defendants are not entitled to a jury of any particular composition. (Taylor v Louisiana, 419 US 522, 528, supra; Fay v New York, 332 US 261, 284.) Thus, the standard by which a claim of an illegally constituted jury is to be measured is whether the complainant has submitted proof sufficient to establish the existence of intentional and systematic discrimination in the jury selection process. (People v Chestnut, 26 NY2d 481, 488; People v Horton, 18 NY2d 355, 359-360, cert den 387 US 934; People v Agron, 10 NY2d 130, 141, cert den 368 US 922.) This test is mandated by the Federal Constitution (see Peters v Kiff, 407 US 493, 502-503, supra; Carter v Jury Comm., 396 US 320, 330) and has been applied consistently in the courts of this State, in the Federal courts (see, e.g., Cobbs v Robinson, 528 F2d 1331, 1334-1335), as well as by our sister States (see, e.g., Commonwealth v Martin, 465 Pa 134, cert den 428 US 923; State v Greeley, 115 NH 461; Roth v State, 218 Kan 413).
In Taylor, the Supreme Court noted that while Louisiana law did not disqualify women from jury service, "in operation its conceded systematic impact is that only a very few women, grossly disproportionate to the number of eligible women in the community, are called for jury service.” (419 US, at p 525.) The court concluded that "[i]f the fair-cross-section rule is to govern the selection of juries, as we have concluded it must, women cannot be systematically excluded from jury panels from which petit juries are drawn.” (419 US, at p 533.) The court stated that, given the view that the Sixth Amendment entitles the criminal defendant to a jury drawn from panels representative of the community, "we think it is no longer tenable to hold that women as a class may be excluded or given automatic exemptions based solely on sex if the consequence is that criminal jury venires are almost totally male.” (419 US, at p 537.)
Applying these principles to the case before us, we conclude that the defendant has not established that the exemption accorded women under then operative provisions of New York law resulted in a systematic exclusion of women from jury service in Nassau County. The appropriate test, as we view it, is not whether the governing statute is on its face unconstitutional, but rather whether the application of the statute led to an impermissible result—i.e., the virtually exclusive male composition of juries. Thus, it is unnecessary to decide *44 whether former subdivision. 7 of section 559 of the Judiciary Law is constitutional. Such a decision would be particularly inappropriate where the offending statute has been repealed by the Legislature. (See Bradley v Judges of Superior Ct. for County of Los Angeles, 531 F2d 413, 418; Matter of Alessi v Nadjari, 47 Ad2d 189, 192; People v Tabb, 80 Misc 2d 431, 435.) It suffices to note that there are several significant differences between the Louisiana procedure under consideration in Taylor and the procedure formerly mandated by our own Judiciary Law. Most notably, the New York statute required qualified women to act affirmatively to exercise their exemption after being summoned and, thus, obtain a release from jury service (see United States v Horton, 526 F2d 884, 889, cert den 429 US 820), whereas Louisiana directed that women had to undertake an affirmative act before they could even be considered eligible for jury service (see People v Moore, 80 Misc 2d 166, 169-170). As we have said, however, the appropriate standard is whether the application of the New York procedure, whatever its differences from Louisiana law, has resulted in particular instances in the systematic exclusion of women from jury service.
The undisputed proof in this case established that, generally, women constituted at least 33% of the prospective jurors in Nassau County. Even granted the fact that women constitute a majority of the population in Nassau County and that a number, therefore, did exercise the exemption accorded by statute, a very substantial number of women did participate on county jury panels. (See People v Sibila, 81 Misc 2d 80.)[2] Moreover, in this particular case, 5 of the original 12 prospective jurors were female and, ultimately, 3 women sat on the petit jury. Under these circumstances, it is impossible to hold that women were systematically excluded from juries in Nassau County.
To conclude our discussion of this issue, we note that Taylor claims have been presented to various courts throughout the State. Almost uniformly it has been found that despite the statutory exemption for women, women have not been systematically excluded from jury service. (People v Sibila, 81 Misc *45 2d 80 [Nassau County], supra; People v Kessler, 81 Misc 2d 492 [Dutchess County]; People v Moore, 80 Misc 2d 166 [Nassau County], supra; People v Tabb, 80 Misc 2d 431 [New York County], supra; but see People v Moss, 80 Misc 2d 633 [Kings County]; see, also, Matter of Alessi v Nadjari, 47 AD2d 189 [1st Dept], supra; People v Prim, 47 AD2d 409 [4th Dept].)
We turn next to consideration of defendant’s contention that the complainant, a 16-year-old mentally retarded girl, was improperly permitted to testify under oath. As it stood at the time this case was tried, the Criminal Procedure Law provided that any person may be a witness in a criminal proceeding, unless the court finds that, as a result of mental disease or infancy, the person does not possess sufficient intelligence or capacity to justify the reception of the testimony. (CPL 60.20, subd 1.) However, the statute expressly stated that "[e]very witness more than twelve years old may testify only under oath.” (CPL 60.20, subd 2.)[3] Thus, the question is whether the trial court abused its discretion in finding that the complainant did have sufficient capacity to comprehend the nature and obligations of an oath and to give an accurate account of the matters at issue.
The testimonial oath is designed to serve two discrete functions: to alert the witness to the moral duty to testify truthfully and to deter false testimony by establishing a legal basis for a perjury prosecution. (Matter of Brown v Ristich, 36 NY2d 183, 189.) To achieve these purposes, it is evident that the giving of an oath to testify truthfully must be a meaningful exercise. The traditional rule still followed in this State, is that all adults are presumed to be competent to testify and commitment to a mental institution does not in itself work an automatic disqualification. (Matter of Brown v Ristich, supra; People v Rensing, 14 NY2d 210, 213.) The test is whether the prospective witness "has sufficient intelligence to understand the nature of an oath and to give a reasonably accurate account of what he has seen and heard vis-á-vis the subject about which he is interrogated.” (People v Rensing, 14 NY2d 210, 213, supra; accord District of Columbia v Armes, 107 US *46 519, 521-522.) The witness must, at a minimum, have "some conception” of the obligations of an oath and the consequences of giving false testimony. (People v Washor, 196 NY 104, 109.)
The resolution of the issue of witness competency is exclusively the responsibility of the trial court, subject to limited appellate review. It is the Trial Judge who has the opportunity to view the witness, to observe manner, demeanor and presence of mind, and to undertake such inquiries as are effective to disclose the witness’ capacity and intelligence. (Wheeler v United States, 159 US 523, 524-525.) "There is no rule by which the extent of the intelligence of an adult who is called as a witness can be measured. It must necessarily be left to the good judgment of the trial court to determine whether such a witness offered by a party to an action shall be sworn. The determination of the trial court should be sustained particularly where the testimony is received and the weight to be given it is left to the jury, unless there is a clear abuse of discretionary power.” (People v Washor, 196 NY 104, 109-110, supra; see People v Nisoff, 36 NY2d 560, 566; Barker v Washburn, 200 NY 280, 283.) Impressions that may be validly drawn only from closehand personal observation cannot be "photographed into the record” for later study by appellate courts. (Wheeler v United States, 159 US 523, 525, supra.) Therefore, the trial court’s determination as to the testimonial capacity of a witness will not be disturbed, particularly where the Appellate Division has sustained the ruling, unless it is plain from the record that the determination was an abuse of discretion. (People v Byrnes, 33 NY2d 343, 350-351.)
In determining whether a particular prospective witness is competent to testify, the trial court may properly consider the testimony of physicians or other persons with information that would shed light on the capacity and intelligence of the prospective witness. (Matter of Brown v Ristich, 36 NY2d 183, 188, supra; Aguilar v State of New York, 279 App Div 103, 105; District of Columbia v Armes, 107 US 519, 522, supra; Richardson, Evidence [10th ed], § 389, pp 367-368.) Thus, in this case, the trial court properly received the testimony of complainant’s teacher for its own consideration in determining the competency of the witness to testify.
As previously noted, the testimony of the teacher was presented to the court in the presence of the jury. In a case of first impression in this court, we hold that it was not error, *47 under the circumstances, to permit the complainant’s teacher to testify, to the jury, with respect to the mental condition of this complainant. Once it has been established to the satisfaction of the trial court that a witness who is about to testify or has testified suffers from a material physical or mental infirmity which affects his or her ability to communicate on the witness stand, the trial court, in a discretion to be exercised with reasonable restraint, may admit evidence which will assist the jury in evaluating the testimony of that witness from another person personally familiar with the infirmity or professionally qualified to testify with respect thereto.
The testimony of specialists or others with particular knowledge of the witness’ mental or physical condition may provide invaluable assistance to the jury. While it is true that the question of witness competency is a matter of law to be determined by the court, it is the traditional and exclusive province of the jury to determine whether the witness’ testimony should be credited and, if so, what weight it should be accorded. In this case, the court ruled that the complainant was legally competent to testify. The jury, of course, has no authority to challenge that determination. The jury, however, can, in discharge of its appropriate function, find, as a matter of fact, that the testimony of the witness, truthful or not, was too weak to be given any credit. In this restricted sense, it would be both inaccurate and inartful to describe such a determination as a finding of incredibility. The finding by the jury is not that the witness’ testimony is false, but that the witness is, in the mind of the jury, so infirm that the testimony cannot be evaluated in an intelligent fashion and, as a matter of intellectual honesty, should not be a factor in arriving at the ultimate conclusion. In order that the jury may accurately appreciate the nature of the witness’ infirmity, the trial court, in its sound discretion, may permit experts or others with personal knowledge of the witness to explain and describe the witness’ condition. In this case, for example, the purpose of the teacher’s testimony was to explain an apparent mental deficiency on the part of the complainant. The teacher testified that although the complainant was chronologically 16 years old, she was operating on a mental level comparable to a child of 12 or 13. With this information, the jury could, from a scientific perspective, intelligently evaluate the complainant’s testimony.
We are careful to note that the teacher’s testimony was *48 restricted by the court to testimony of an objective nature. In fact, the trial court several times sustained objections to questions calling for conclusions or characterizations. As we view the issue, independent testimony with respect to a witness’ faculties is designed to provide the jury with an objective analytical framework for evaluation of the witness’ testimony. The court may not permit the independent witnesses to stray from scientific and objective data and criteria. Thus, it would be error for the court to permit a witness to express a view as to the credibility or believability of the impaired witness. Notably, this case does not involve a situation where the independent witness attempted to express a view, scientific or otherwise, on the degree of confidence, or lack thereof, to be placed upon the complainant’s testimony. By our holding today, we do not suggest, or even intimate, that an expert may ever pass his own judgment on a witness’ credibility and impart that judgment to the jury. Such testimony would be a serious usurpation of the jury’s prerogative and responsibility. We do hold that objective data can be related to the jury to assist it in performing its proper trial function. Although this precise issue has received scant attention from the authorities (compare 2 Wigmore, Evidence [3d ed], § 497, p 589, with Richardson, Evidence [10th ed], § 389, p 368), we are convinced that sophisticated and modern techniques of physical and psychological evaluation and analysis may play an appropriate but limited role in the trial of cases pursuant to well-founded concepts of the law of evidence.
Moreover, we believe that where a particular witness’ testimony may be crucial to the case and it is established that the witness’ testimonial ability is impaired, independent evidence respecting the nature of the impairment may be presented to the jury prior to the actual testimony of the impaired witness.
The advantage to admitting the preliminary testimony of physicians, teachers, or others with knowledge of the alleged incompetent’s state is that both the court and the jury may be alerted to the nature of the witness’ condition and may be provided with a framework in which the testimony and behavior of the witness may be considered. Such an approach was followed in the ancient case of Regina v Hill (5 Cox Crim Law Cases 259), cited and quoted with approval in the leading American case of District of Columbia v Armes (107 US 519, 522, supra), which in turn was cited in Matter of Brown v Ristich (36 NY2d 183,188, supra). The order of the presentation *49 of witnesses is generally left to the parties themselves, subject to the general supervisory discretion of the court. If it appears advisable to permit introductory testimony to set the stage before the alleged incompetent testifies, the court may do so provided, of course, the incompetent does actually testify and that the testimony is otherwise admissible. Here, the complainant was ruled to be legally competent to testify and did actually testify.
It is crucial that the witness’ ability to testify be in issue. We have little doubt that the complainant’s mental state was in issue prior to the receipt of the teacher’s testimony. The court, the parties, and the jury were all aware that the mental awareness of the complaining witness would be an issue at the trial. Indeed, her apparent mental retardation was known to both the prosecution and to the defendant by virtue of defendant’s very occupation—driver of a bus that transported retarded children to special classes—since it was his occupation that brought him into contact with the complainant. Significantly, the prosecutor, in his opening to the jury, specifically set forth his intended order of witnesses. "Now, the People intend to produce three witnesses, the first witness * * * is a teacher of the complainant * * * and he will testify as to her mental age and her educational background and her general character and personality. The next witness will be * * * the complaining witness and the third and final witness of the People will be Det. Michael Di Benedetto who will testify as to a statement made to him by the defendant.” Although the defense objected to other aspects of the prosecutor’s opening, no objection was made to this mention of witnesses and to the proposed order of proof. The point here is not that the defense was bound to object to the testimony of either the teacher or the complainant at this juncture of the trial, but simply that the defense knew that the cognition of the complainant would be a crucial issue in the case. Hence, the issue was in the case well before the teacher or the complainant physically and formally mounted the witness stand. In truth, the issue of credibility based on mental infirmity, in view of the nature of the alleged crime and its victim, permeated the entire case.
The complainant’s responses to the court’s preliminary inquiry and her later answers to questions propounded on direct and cross-examination .raise significant questions as to the depth of her capacity to recollect events as well as to her *50 intelligence. However, on this record, we cannot conclude that the witness was so deficient, by reason of her mental infirmity, that the reception of her evidence was a clear abuse of discretion. The witness stated that she was able to testify truthfully and that she could distinguish truth from falsity. From these statements, her demeanor and appearance, and the testimony of her teacher, the trial court could properly conclude that she possessed sufficient capacity to testify. Since the court’s determination has a basis in the record, we will not now disturb it. (People v Nisoff, 36 NY2d 560, 566, supra; People v Yonko, 34 NY2d 825; People v Washor, 196 NY 104, supra.) In reaching this conclusion, we are sensitive to the fact that, in particular cases, an overly restrictive approach to the evidentiary rules respecting testimonial capacity could work to deny the mentally infirm the right to complain of their treatment at the hands of those nominally responsible for their care. (See Matter of Brown v Ristich, 36 NY2d 183, 191-192, supra.) While we recognize the need to guard against the occasional abuse of discretionary power, we also refuse to ignore the practicalities imposed by an even harsher reality.
Finally, we find no error in the admission into evidence of the hospital records of the complainant. The case against the defendant rested primarily upon defendant’s twice repeated admissions of guilt. The fact that complainant had an abortion is evidence that a crime (sexual intercourse with an underage female) was committed by someone and, thus, is sufficient to corroborate defendant’s admissions (CPL 60.50; People v Reade, 13 NY2d 42, 45; see People v Daniels, 37 NY2d 624, 629) and was admissible for that purpose. The trial court was careful to charge the jury, as requested by the defense, that "evidence of pregnancy is' no evidence to corroborate the testimony that the defendant was the guilty party.”
The order of the Appellate Division should be affirmed.

. The two alternate jurors were male. The identity and gender of the members of the jury was disclosed in the course of a postverdict poll of the jury conducted by the trial court in reference to another issue, whether the jury was influenced by a redacted sentence from defendant’s Grand Jury testimony that was inadvertently read to the jury by the court reporter. With respect to this issue, it suffices to note that several jurors did not hear the comment, and that all the jurors stated that the comment was not discussed by the jury in the course of its deliberations nor did it form a basis for the finding of guilt.

. In People v Sibila, it was stipulated that 54% of the eligible jurors in Nassau County in 1974 were women, that 70% of the women claimed the statutory exemption, and that 26% to 33% of the 60,000 names in the Nassau County jury wheel that year were female. Based on this evidence, the County Court concluded that the defendant had failed to establish the systematic exclusion of women.

. The statute has since been amended to permit a person over the age of 12 to testify without giving an oath, provided that the court finds that while the witness cannot understand the nature of an oath, the witness does have suificient capacity to justify the reception of the testimony. (CPL 60.20, subd 2, as amd by L 1975, ch 133; see Bellacosa, 1975 Supplementary Practice Commentary, McKinney’s Cons Laws of NY, Book 11 A, CPL 60.20, p 75.)