Juan PEREZ and Edward Pagan,
Petitioners,

v.

Paul METZ, Warden, State Correctional
Facility, Comstock, New York,
Respondent.

77 Civ. 835 (WCC).

United States District Court,
S. D. New York.

July 5, 1977.

See also D.C., 459 F.Supp. 1141.

Diller, Schmukler & Asness, New York City, for petitioners; Domenick J. Porco, New York City, of counsel.

Louis J. Lefkowitz, Atty. Gen., of State of New York, New York City, for respondent; Nicholas G. Garaufis, Asst. Atty. Gen., New York City, of counsel.

## MEMORANDUM AND ORDER

CONNER, District Judge.

Juan Perez and Edward Pagan have filed a joint petition for a writ of habeas corpus pursuant to 28 U.S.C. §§ 2241 and 2254. Petitioners were brought to trial in late January 1976 in New York State Supreme Court, Bronx County, and were convicted, upon a jury verdict, of the murder of Angel Ortiz. On April 9, 1976, both men were sentenced to terms of imprisonment of twenty years to life and are currently incarcerated in a New York State Correctional Facility in Comstock, New York. Their convictions were affirmed without opinion by the Appellate Division, First Department [390 N.Y.S.2d 769], and leave to appeal to the Court of Appeals was denied by Judge Wachtler.

Perez and Pagan were represented by the same lawyer at trial, and that fact underlies their principal constitutional claim—that the common representation of their conflicting interests deprived them of their Sixth Amendment right to the effective assistance of counsel and to their due process right to a fair trial. Both petitioners also allege a violation of their constitutional rights in the State's failure to provide corroboration of the testimony of its principal witness, Letitia Gonzalez; in the court's sealing of the courtroom during the testimony of two of the prosecution witnesses; in certain of its instructions to the jury; and in remarks made by the prosecutor during his opening statement. Finally, on his own behalf, Pagan contends that the proof of his guilt was constitutionally insufficient. Reference to petitioners' appellate submissions discloses that the state courts have had a fair opportunity to pass upon the contentions advanced by petitioners herein. This Court is thus satisfied that petitioners have exhausted their state remedies in accordance with 28 U.S.C. § 2254(b) and (c). *Picard v. Connor,* 404 U.S. 270, 276, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971).

## I.

### A. The State's Case

According to the evidence at petitioners' trial, the victim, Angel Ortiz, was found murdered in an apartment at 75 West 175th Street in the Bronx on July 28, 1973. The police discovered his bullet-riddled body in a sitting position on the living-room couch, with a .38-caliber Armenius revolver, containing four spent and two live rounds, in or near his hand. Five additional rounds of ammunition were found in the dead man's pockets. The police recovered twelve pieces of ballistics evidence from the living-room floor and were able to determine that three of these came from a .44-caliber semi-automatic rifle; that one was consistent with having been fired from the .38-caliber Armenius revolver recovered at the scene; and that two had also been fired from a .38-caliber revolver, but not from the Armenius. The evidence, in the opinion of the State's ballistics expert, thus indicated the use of at least three firearms.

The medical examiner who performed the autopsy on the deceased certified the cause of death as "multiple bullet wounds of the head, the abdomen, the extremities, the lung, the aorta, spleen and stomach, internal hemorrhage." These injuries consisted of seven bullet wounds, four of them affecting vital organs, and at least one the result of a .38-caliber slug, from a revolver other than the Armenius.

No one was apprehended in connection with the killing until August 6, 1973. Then, on information provided by Letitia Gonzalez, the tenant of the apartment where the shooting had occurred, the police arrested the defendants and a third man, Alberto Gordils. Gonzalez proved to be the State's

sole eyewitness and gave critical testimony at trial.

Gonzalez became acquainted with the defendants more than a year before the shooting, when they were all neighbors on Grand Avenue in the Bronx. In the summer of 1973, Pagan introduced her to Alberto ("Al") Gordils. Then, slightly more than a week before the July 28, incident, Pagan and Gordils visited her apartment looking for Juan ("Johnny") Perez. She did not know where he was. The two men then asked her if she "wanted to do a job for them," which they assured her would pay well. In need of funds, she agreed, was given ten dollars, and was told to get friendly with a "guy" (Angel Ortiz) whom they subsequently pointed out to her in the neighborhood. She made Ortiz's acquaintance and socialized with him on three separate occasions in a bar, drinking liquor and smoking marijuana. Two of those times, Pagan and Gordils drove her to within two blocks of the meeting-place, and for four days in succession Gordils, in Pagan's presence, supplied her with spending money.

On July 28, 1973, Pagan and Gordils took her to a candy store and had her telephone Ortiz. Gordils took the receiver to verify Ortiz's identity and nodded affirmatively to Pagan. Gonzalez then made a date with Ortiz for approximately 8:30 P. M. and was instructed by Gordils to invite him to her home. On inquiring as to the purpose of what they were doing, Gordils said "Just do [your] job." The witness noted that, during all of her conversations with Gordils, Pagan was present.

That evening, she and Ortiz met, and then returned to her apartment at approximately 9:00 P. M. While they were seated on the sofa in the living-room, the kitchen light went out. Gonzalez arose and saw Johnny Perez enter the living-room, carrying a .38-caliber pistol. Following him was Gordils with a rifle or shotgun. Pagan, the last to enter, remained at the threshold of the kitchen and living-room, approximately

fifteen feet from Ortiz. Gonzalez said that she was unable to remember whether Pagan was armed, that it was too dark to see. Perez, who was the closest to Ortiz, less than fifteen feet away, said to him, "don't move, you are going with us." Perez was the only one who spoke. Ortiz then placed his hand in his jacket and fired his gun—a single time, according to Gonzalez's recollection. Perez then "went crazy shooting." He fired more than five times. After he had finished, Gordils commenced firing, and, at that point, Gonzalez ran out of the apartment. Pagan was the only one of the three who did not shoot.

Gonzalez stood in the street crying, until Perez and Millie Rodriguez [1] found her and took her for a walk. When she asked them "why they [had] done] that," Perez said "they had to do it," and he told her to "go back, just make up a story, nothing will happen to you." She returned to the scene and lied to the police when they initially questioned her, but approximately a week and a half later led them to the defendants, after being told by a detective that the police "knew * * * what [had] happened."

The day following the shooting, Gordils gave her and Rodriguez five hundred dollars, which she used to help her mother and to buy clothes for herself and her children.

Her contact with Pagan continued in the period following the incident. She first saw him with Perez and Gordils the day after the shooting, but there was no conversation between them. Then, in December of 1974, she met Pagan on Grand Avenue. He asked whether she "wanted to go to Puerto Rico in August until all this is over." At first she did not want to go, but then, she testified, "I didn't have any choice. So I went down there." Accompanying her were Millie Rodriguez and Pagan and his wife. Pagan paid for her and Millie's flight to Puerto Rico and for their house and expenses for a period of six months. He stayed with them for a week on the initial

---

1. Millie Rodriguez was the sister of Letitia Gonzalez's common-law husband, Ruben Rodriguez. She was also Juan Perez's girlfriend.

trip down, and then, during the ensuing six months, visited on two occasions, each time for a period of three days. When asked if Pagan talked about the case at all, she said he did not. After six months had passed, Pagan terminated his support, and the women were forced to earn their airfare home. They returned to New York on July 31, 1975. Toward the end of the summer, she encountered Pagan on the street. She tried to run away from him, but he stopped her and told her the trial was not over yet. Gonzalez told him she did not care what happened because she had lost everything and "they [weren't] going to replace anything * * * [she] had lost." On that or a subsequent occasion, Pagan told her that the trial would be over on October 7, 1975.[2] It was only later that she learned that she was being sought as a witness in the case.

Besides Gonzalez, one other prosecution witness, Mercedes Aponte, purported to place the defendants at the scene of the shooting. Aponte testified that she was sitting on the stoop at 75 West 175th Street on the night in question, and saw the two defendants, together with a third may carrying a box, walking "in the direction of" an apartment at that address.

### B. The Defense

#### (1) Counsel's Opening Statement

In his opening statement to the jury, counsel advanced a single line of defense, purportedly on behalf of Perez and Pagan jointly—the absence of criminal intent. The message he sought to convey was that the defendants did not share the intent possessed by the truly culpable party, Alberto Gordils. Counsel argued that both defendants, as well as eyewitness Letitia Gonzalez, were "used * * * as a foil * * * used as a shield" by Alberto Gordils. Gordils was described as a "psychotic" and a "killer," as a man with "an insatiable desire to kill." Counsel suggested that

when Gordils began "pumping bullets into the victim," the defendants "didn't know what he intended to do. They had no idea that he was going to do that."

#### (2) Counsel's Cross-Examination

To bolster his contention that Gordils was the only guilty party, defense counsel elicited in his cross-examination of Detective Carlos Ortiz that Gordils was involved in the narcotics trade, and that Gordils and the deceased had had disagreements over narcotics prior to the incident in this case. Counsel also brought out that Gordils had a record of commission of other crimes, including murder.

In his cross-examination of Mercedes Aponte, counsel confronted the witness with statements in her Grand Jury testimony that she had seen only two men enter 75 West 175th Street on the night in question, and that Perez was not one of them.[3]

His cross-examination of Letitia Gonzalez, however, essentially conceded Perez's presence in the apartment and was devoted exclusively to establishing Pagan's lack of complicity in the actual shooting of Ortiz and the innocent nature of his payments of money to Gonzalez following the incident. His questions purported to show that the shooting had ended by the time Pagan entered the apartment, or, at the very least, lasted only seconds in his presence; that Pagan was at the rear of the three-man contingent and had no weapon or ammunition; and, finally, that he ran out of the apartment immediately following Gonzalez. With respect to the payments that Pagan made to Gonzalez after the killing, counsel succeeded in having the witness affirm that they were simply "an act of generosity." She testified that the money was given to her to help her feed her children.

#### (3) The Direct Case

The direct case for the defense consisted of testimony from two witnesses—Pagan,

---

**2.** Perez and Pagan were in fact brought to trial on January 30, 1976; Gordils had died in the meantime.

**3.** Her final testimony in this connection, given on re-direct examination, was that she simply "did not know" whether or not Perez had entered 75 West 175th Street on the night in question.

and a lieutenant in the New York City Fire Department, testifying to Pagan's good reputation.

In questioning Pagan, counsel first elicited his status as husband, father and veteran honorably discharged from the armed forces, and then had Pagan sketch his version of his relationship with Gordils and his own and Perez's involvement in the shooting. Pagan testified that he knew Gordils as an extremely generous individual, the owner of two sports car, and a person always well supplied with money. Pagan was a ready and frequent borrower of both the cars and the money, and a performer of errands for Gordils as well.

Letitia Gonzalez was one of those to whom Gordils gave his money, but Pagan simply assumed, as counsel suggested in his questioning, "that that was just part of his generosity." Pagan asserted later in his testimony that, while present at Gordils' conversations with Gonzalez, he never listened or paid any attention to them. On direct examination, Pagan was insistent that the name of Angel Ortiz never arose in any of his conversations with Gordils and was a name with which he was unfamiliar prior to the shooting incident. On cross-examination, however, he admitted having a recollection of Gonzalez's telephone call to Ortiz on the night of the incident, as well as of Gordils' listening in on the receiver and then nodding in Pagan's direction.

On the night of July 28, 1973, Gordils spoke briefly with Millie Rodriguez [4] and then told him and Perez that he had something to take care of up the block. He asked them to accompany him "just in case this guy got rough with him." Gordils did not indicate to either of them the purpose of his visit or state an intention to harm or to kill Angel Ortiz. According to Pagan, Perez was the first to enter Gonzalez's apartment following their arrival at 75 West 175th Street. Gordils came next, carrying a box. Pagan had "no idea" that the box contained a gun (he simply assumed that Gordils was intending to give or to sell

something to Ortiz) and did not know whether or not Perez was armed with a revolver. The three men entered a dark kitchen, Pagan at the rear, and within moments the shooting began. Neither Perez nor Gordils was in the kitchen with Pagan during the barrage of gunfire. Pagan, hearing the shots, but seeing nothing, ran from the apartment and into the street, frightened.

Both Pagan and Perez were warned by Gordils immediately following the incident to keep their silence. That evening, Perez told Pagan that "he didn't know, you know, he didn't know what was going to happen." On a subsequent occasion, Gordils told Pagan that he had killed Ortiz in order to get even, because Ortiz had shot him in a past incident.

Pagan remembered going to Puerto Rico following the shooting, with his wife, Millie Rodriguez and Letitia Gonzalez. In response to counsel's question of how they happened to go as a group, Pagan said that it was Millie's suggestion—she told Pagan that "it would be nice for her friend and she to take a ride down there too." According to Pagan, Gordils paid for the women's flight down as well as for the expenses of their stay.

On the subject of his own payments to Gonzalez, Pagan affirmed, in response to counsel's questioning, that "from time to time" he gave "a few dollars to Lettie" in order for her to buy groceries for her children. He admitted running into Gonzalez on her return from Puerto Rico, but denied speaking to her about the case, and denied that she tried to run away from him. She did tell Pagan that she was afraid.

#### (4) *Counsel's Summation*

The arguments put forth by counsel in his closing argument assumed the presence of both defendants at the scene of the shooting. In the case of Perez, counsel stated, in rather cursory and undeveloped fashion, a theory of self-defense, in the following terms:

> Gonzalez return to the latter's apartment (Tr. 230–31).

---

4. His conversation with her apparently occurred directly after she had seen Ortiz and

"Now, what happened? In walks Mr. Perez. The victim starts shooting at him. And the testimony from the girl is that he started shooting back. Now this all happened within seconds. These things happen very fast.

"Now, who else—what man, either on this jury or anywheres * * * would in the face of being fired upon stand up, put [sic] their hands, and say, go ahead, shoot, or kill me, *or would they instinctively turn around and try to hit back*, turn around and run? Lopez did just that. When he started running, Pagan— again, Lopez. I mean Perez. Did just that."

The remainder of his summation was devoted virtually exclusively to the defense of Pagan. It was suggested that Pagan had attached himself to Gordils simply because of his wealth and flair. Counsel then emphasized Pagan's unawareness of the prior conflict between Alberto Gordils and the deceased, and of Gordils' intentions on the night of the shooting; the testimony of Letitia Gonzalez indicating that Pagan, alone of the three men, was unarmed; and the testimony of Pagan himself, stating that he ran from the apartment at the moment the firing commenced. Additionally, the jury was urged to weigh, as against the worthless victim, Pagan's good character and his devotion to his wife and four children. As a seeming afterthought, the jury was also asked to heed the fact that Perez was the father of a child.

## II.

■■ Several of the claims raised in this petition require only the most cursory treatment. The first is that advanced on behalf of Pagan individually, *i. e.*, that there was insufficient evidence of his guilt. Except in the rarest of cases, claims respecting the sufficiency of the evidence are not of constitutional dimension, and, thus, not within the jurisdiction of the federal court on a petition for habeas corpus. *Mapp v. Warden, N. Y. State Corr. Inst., etc.*, 531 F.2d 1167, 1173 n.8 (2d Cir. 1976); *United States ex rel. Terry v. Henderson*, 462 F.2d 1125

(2d Cir. 1972); 28 U.S.C. §§ 2241(c)(3), 2254(a). The exceptional case is one in which the State court conviction is "so totally devoid of evidentiary support" as to constitute a denial of due process. *Mapp v. Warden, supra*. See *Vachon v. New Hampshire*, 414 U.S. 478, 94 S.Ct. 664, 38 L.Ed.2d 666 (1974); *Thompson v. Louisville*, 362 U.S. 199, 80 S.Ct. 624, 4 L.Ed.2d 654 (1960). That was obviously not the case here. The State's chain of proof more than adequately established Pagan's knowing involvement in each successive stage of a plan to kill Angel Ortiz. Although Pagan was not shown to have been one of those who actually shot the victim, the finding of his guilt properly rested on evidence of his having aided in the commission of the homicide with the requisite mental culpability. N.Y.Penal Law § 20.00.

■ Arguing that the State's principal witness, Letitia Gonzalez, was an accomplice as a matter of law, both petitioners complain that they were convicted upon her uncorroborated testimony. "Uncorroborated accomplice testimony," however, "may constitutionally provide the exclusive basis for a criminal conviction." *United States v. De La Rosa*, 450 F.2d 1057, 1060 (3d Cir. 1971), *cert. denied*, 405 U.S. 927, 957, 92 S.Ct. 978, 30 L.Ed.2d 800 (1972). See also *United States ex rel. Hicks v. Fay*, 230 F.Supp. 942, 946 (S.D.N.Y.1964). Petitioners' claim is therefore improperly raised in this forum. A witness's status as an accomplice and the absence of corroborative evidence are questions solely of State law. *Johnson v. Turner*, 429 F.2d 1152, 1155 (10th Cir. 1970); *Application of Aschmeller*, 403 F.Supp. 983, 985 (S.D.S.D.1975), *aff'd*, 534 F.2d 830 (8th Cir. 1976); *Lee v. Henderson*, 342 F.Supp. 561, 566 (W.D.N.Y.1972); *United States ex rel. Hicks v. Fay, supra*.

■■ Petitioners allege improprieties in remarks of the prosecutor during his opening statement and in the court's charge. When the prosecutor addressed the jury in his opening statement, anticipating the evidence he would adduce at trial, he stated that Pagan had "a gun in his hand" on the night of the shooting. Additionally, he

stated that Pagan warned Gonzalez following the incident, in threatening language, not to testify against him. Since neither predicted item of proof materialized in Gonzalez's actual testimony, Pagan claims he was denied a fair trial. But what occurred here falls far short of establishing a constitutional violation. Our inquiry in reviewing a state court conviction is limited to a determination of whether the remarks in question "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974); see *Malley v. Manson*, 547 F.2d 25, 28–29 (2d Cir. 1976). We must observe the distinction between "ordinary trial error of a prosecutor" and "that sort of egregious misconduct" which would amount to a denial of constitutional due process. *Donnelly v. DeChristoforo, supra*, 416 U.S. at 647–48, 94 S.Ct. 1868.

■ Here, the initial misstatement that Pagan was armed was corrected by the prosecutor himself during summation (Tr. 381, 391) to conform to the testimony actually presented by Gonzalez at trial—that she could not remember, or because of the darkness had been unable to discern, whether or not Pagan had been carrying a weapon. We note, in any event, that the prosecutor's misstatement was put to good use by counsel in his own argument to the jury, as a vantage point for stressing the State's failure to prove its case against Pagan (Tr. 373).

■ With respect to Pagan's alleged threat to Gonzalez, it should, of course, never have been mentioned by the prosecutor in his opening statement absent a certainty that it would be supported in the proof. However, what was likely to have influenced the jury in this case was not the alleged threat—neither proved nor adverted to again at trial—but the actual evidence of coercive tactics employed by Pagan to dissuade Gonzalez from testifying. In the aftermath of the incident, according to Gonzalez, Pagan had forced her to go to Puerto Rico, and had left her stranded there after a period of six months, without resources

for her return trip. At their later encounter in New York, Pagan spoke of the case to Gonzalez, against her will, and even informed her—contrary to actual fact—of the date on which the trial would be concluded. It was the above incidents, rather than the unproved threat adverted to a single time in the prosecutor's opening statement, which established Pagan's consciousness of guilt, and, accordingly, the reference to the threat could not itself have resulted in the deprivation of a fair trial.

■ The trial court, it is next contended, marshalled the evidence with a bias toward the prosecution and gave misleading instructions on motive and intent. Suffice it to say that the charge, in its entirety, fairly presented the issues of fact and applicable rules of law to the jury. See *Cupp v. Naughten*, 414 U.S. 141, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973); *cf. United States ex rel. Tirado v. Bombard*, 423 F.Supp. 1245, 1249 (S.D.N.Y.1976).

■ The court is also said to have violated petitioners' constitutional right to a public trial in sealing the courtroom during the testimony of Mercedes Aponte and Letitia Gonzalez. The court's action was taken only in the light of the prosecutor's disclosure that the witnesses in question were in fear of their lives and would be reluctant to testify in a courtroom frequented by a large audience of the defendants' friends and relatives (Tr. 152–53, 162–63). Recognizing the gravity of the crime on trial, and the fact that the right to a public trial must be balanced against the interests in the preservation of order and the protection of the State's witnesses, we have no doubt that the court's temporary exclusion of the public was well within the bounds of proper discretion. *United States ex rel. Lloyd v. Vincent*, 520 F.2d 1272, 1273–74 (2d Cir. 1975); *United States ex rel. Bruno v. Herold*, 408 F.2d 125, 126–28 (2d Cir. 1969).

■ The only claim which gives us considerable pause is that asserting the denial of *Perez's* Sixth Amendment right to the effective assistance of counsel, as the result of a conflict of interest on the part of his

and Pagan's lawyer. The claimed abridgment of the right to counsel, while urged on behalf of both petitioners, has no foundation so far as Pagan is concerned. But, because we have questions as to whether Perez received the "zealous and independent" representation to which he was entitled, *United States v. Carrigan*, 543 F.2d 1053, 1057 (2d Cir. 1976), we have determined to order a hearing to allow the full airing of his claim.

■ The standard in this Circuit is exacting where a conflict of interest is alleged. It is settled that "some specific instance of prejudice, some real conflict of interest, resulting from a joint representation must be shown to exist before it can be said that an appellant has been denied the effective assistance of counsel." *United States v. Carrigan, supra*, 543 F.2d at 1055; *Abraham v. United States*, 549 F.2d 236, 239 (2d Cir. 1977); *United States v. Lovano*, 420 F.2d 769, 773 (2d Cir. 1970). The petitioners in the instant case were placed in at least potentially conflicting positions by virtue of the ballistics evidence that there were two murder weapons—one, the .44-caliber semi-automatic rifle that was brandished by Gordils, and the other, a .38-caliber revolver that must have been carried by one of the two defendants. It was obviously crucial to the defense of Pagan to *adopt* Gonzalez's testimony that he, rather than Perez, was weaponless, or, at the very least, did not fire a weapon during the incident; and so counsel placed considerable emphasis upon this testimony at every available opportunity during the trial—on cross-examination of Letitia Gonzalez, in motions to dismiss before the court (Tr. 276–83, 365–67), and, most importantly, in his closing argument to the jury. The sought-after inference on Pagan's behalf was that, lacking a weapon, he did not share the intent to kill required for conviction. Counsel had Pagan testify in his own behalf to buttress his defense. In that testimony, Pagan pleaded ignorance of the plot against Ortiz

and of Gordils' criminal intentions, and excluded himself from involvement in the actual shooting. He cast in an innocent light his trip to Puerto Rico with the State's key witness (Letitia Gonzalez) and his payments to Gonzalez following the incident.

■ Hence, through the examination of Pagan himself, the cross-examination of Letitia Gonzalez and the determined summation to the jury on Pagan's behalf, counsel rendered Pagan a vigorous defense, exploiting the full breadth of the evidence and inferences which might inure to his benefit. Moreover, Pagan could have emerged only the better in the eyes of the jury as a result of the contrast his position presented to that of Perez. As noted, the assumption of their common counsel throughout the trial was that Perez, rather than Pagan, wielded the second murder weapon. Thus, to the extent that there was a potential conflict in their positions, Pagan was the obvious beneficiary. We are simply at a loss to discern how independent counsel could have rendered a more diligent defense on behalf of his client, and, accordingly, find no prejudice to Pagan from the joint representation.

■ But, while beneficial to Pagan, counsel's adoption of Gonzalez's testimony placed Perez in particularly difficult straits. His own lawyer's acceptance of the evidence that he entered the living-room of Gonzalez's apartment with gun drawn, and then fired his weapon at the victim more than five times in succession ("went crazy shooting"), left him, realistically speaking, with singularly unpersuasive defenses. That of "lack of intent to kill," while viable in the case of the defendant *without* a weapon (Pagan), cut against the grain of reasonableness and common sense in the case of Perez, considering the nature of the weapons employed (both his and Gordils') and the seriousness of the wounds inflicted. See *People v. Ozarowski*, 38 N.Y.2d 481, 381 N.Y.S.2d 438, 443, 34 N.E.2d 370 (1976); *People v. Agron*, 10 N.Y.2d 130, 218 N.Y. S.2d 625, 631–32, 176 N.E.2d 556 (1961).[5]

5. In accordance with New York law, the jury was instructed that "a person intends the natural and necessary and probable consequences of [his] act" unless accomplished "under cir-

That of justification foundered against the applicable provisions of the New York Penal Law (§ 35.15(1)(a), (b)), denying the defense to one who "provoked" the victim's conduct or was himself the "initial aggressor." [6] While, as the trial court itself ruled (Tr. 280–83), these defenses raised issues of fact for the jury, the cards were, nonetheless, quite heavily stacked against Perez.

The present record provides an inadequate basis for us to determine whether the proper representation of Perez demanded the pursuit of an alternative defensive strategy—one which would vigorously have challenged the testimony of Letitia Gonzalez branding Perez, rather than Pagan, as the wielder of the .38-caliber revolver. Perez, of course, was condemned as having used that weapon essentially on the basis of Gonzalez's testimony alone.[7] What rendered her testimony particularly suspect was the nature of her relationship to Pagan, a man to whom she was beholden financially in the period following the incident, and of whom she appeared to be in considerable fear. The record raises the possibility, therefore, that, out of concern

for her own safety and well-being, she tailored her testimony on the crucial issue of the possession and use of the .38-caliber weapon, exculpating Pagan and condemning Perez.

With simply the record of the trial before us, it is impossible to determine why counsel chose not to discredit the single prosecution witness against his client and not to cast the blame for the shooting on co-defendant Pagan, whose intimate involvement with Gordils, and in the conspiracy against Ortiz, made him the more logical candidate as the second gunman. It is certainly conceivable that, in rejecting such a strategy, counsel made a sound tactical choice, based upon his thorough investigation of the circumstances of the incident and his interviews with witnesses. On the other hand, his strategic decision may have proceeded solely from considerations of loyalty to the co-defendant.

We would note, in this connection, that Perez was advised by counsel not to take the witness stand. The reasons for the

---

cumstances preclud[ing] the existence of such an intent" (Tr. 435). The jury was further instructed:

"[I]f you find that the defendants shot Mr. Ortiz you have a right to consider the nature of the instrument used here, a forty-four magnum carbine, and a thirty-eight caliber pistol, the manner in which it was used, what the defendants said, if anything, what they did, and the manner in which they allegedly committed the act.

"You have the right to consider the testimony of Dr. Hyland as to where the wounds were inflicted. If you find that the wounds were in a vital part of the victim's body, the law gives you the right solely by reason of the infliction of such wounds to infer an intent on the part of the assailant to commit an act of killing.

"You may consider the location of the wounds and whether or not a dangerous weapon was used to inflict such wounds on the victim, and whether under the circumstances in which it was used the weapon was readily capable of causing death or serious physical injury.

"You are not bound to infer an intent from the use of a dangerous weapon, or the infliction of serious physical injury on the vital parts of the victim's body, but you may draw such an inference. However, you should consider all of the evidence in determining the defendant's intent, if any, when they allegedly shot Mr. Ortiz." (Tr. 437 39).

6. The statutory provisions read as follows:

"§ 35.15 Justification; use of physical force in defense of a person

1. A person may, subject to the provisions of subdivision two, use physical force upon another person when and to the extent he reasonably believes such to be necessary to defend himself or a third person from what he reasonably believes to be the use or imminent use of unlawful physical force by such other person, unless:

(a) The latter's conduct was provoked by the actor himself with intent to cause physical injury to another person; or

(b) The actor was the initial aggressor; except that in such case his use of physical force is nevertheless justifiable if he has withdrawn from the encounter and effectively communicated such withdrawal to such other person but the latter persists in continuing the incident by the use or threatened imminent use of unlawful physical force * * *."

The court instructed the jury substantially in the language of the statute (Tr. 458–63).

7. Naturally, Pagan's testimony, by clear implication, also condemned Perez as the shooter, although, considering the source, the jury might well have accorded it little weight.

advice are not apparent from the record. Judging from the fact that counsel had originally brought a *Sandoval* motion on Perez's behalf [*People v. Sandoval*, 34 N.Y.2d 371, 357 N.Y.S.2d 849, 314 N.E.2d 413 (1974)], it can be deduced that he was concerned with his client's prior criminal record, consisting of two convictions. However, the court granted the *Sandoval* motion with respect to one of the convictions (Tr. 257–58), leaving only the misdemeanor of criminal possession of stolen property as material for impeachment. Still, counsel advised Perez not to testify, and Perez agreed that he would not "go against [counsel's] wishes" (Tr. 283). Perez now suggests that the "real reason" for counsel's advice was his fear that his own testimony would conflict with Pagan's (Petitioner's Brief at 8). With no offer of proof from Perez as to what the content of his testimony would have been, we are not in a position to judge counsel's motives. It is difficult to imagine, however, that the presence of a single misdemeanor conviction on Perez's criminal record would itself have caused counsel to advise him not to testify in a Class A felony trial.

Because the issues we have discussed remain unresolved on this record, we are ordering a hearing.[8]

 One final word. It has been difficult for us to countenance the fact that, on a petition alleging a deprivation of the Sixth Amendment right to the effective assistance of counsel because of a conflict of interest, a single lawyer has chosen to represent both Pagan and Perez in the federal district court: the same attorney, incidentally, who represented petitioners on their state court appeals. Without questioning counsel's good faith, we deem it unwise, in collateral as well as direct proceedings, to have common counsel represent two individuals—especially co-defendants in a criminal case—whose interests may be adverse. Accordingly, separate counsel will be assigned to represent Perez, unless within fifteen days from the date of this order, the Court receives an affidavit from Perez requesting permission to proceed with present counsel.

For the reasons stated above, the petition of Edward Pagan is denied. With respect to that of Juan Perez, counsel will be contacted in due course to arrange a mutually convenient time for a hearing.

SO ORDERED.

---

8. It should be noted that our examination of the transcripts in this proceeding has disclosed no evidence of Perez's waiver of his right to separate counsel. Nor has the Attorney General suggested that such a waiver occurred, either at or before trial. Should the Attorney General so request, however, he will be provided the opportunity to inquire into the issue at the hearing.