OPINION OF THE COURT
Irving Lang, J.
Two unique issues are raised by defendant’s motion to dismiss the indictment: (1) Can the ultimate purchaser of narcotics be indicted for conspiracy with the sellers to criminally possess a controlled substance? and (2) Do computer records and ledger books of alleged drug transactions maintained by a statutory accomplice constitute independent corroborative evidence of the testimony of the accomplice within the meaning of CPL 60.22?
BACKGROUND
Defendant Michael Macklowitz stands indicted on one count of conspiracy in the fourth degree, one count of criminal possession of a controlled substance in the fourth degree, three counts of attempted criminal possession of a controlled substance in the fourth degree and six counts of criminal possession of a controlled substance in the seventh degree. The indictment, containing a total of 1,169 counts, was the culmination of an investigation in which 32 defendants were arrested and charged with various conspiracy counts and substantive drug sale and possessory crimes.
The People allege that during 1985 (and for several years prior thereto) Jack Buccafusco was in the business of selling *234 cocaine. Buccafusco obtained his cocaine from defendant Walter Gilderubio. He stored a large stash of drugs and weapons in a safe secreted in an apartment (known as the studio) located in Staten Island. Buccafusco’s right-hand men in this venture were defendants Michael Giammarino and Angelo Tranquillino. Both Giammarino and Tranquillino obtained large amounts of cocaine directly from Buccafusco. Tranquillino’s and Giammarino’s Staten Island homes were allegedly used as storage and distribution points for the cocaine. With the help of several associates and employees, they either sold cocaine to various smaller scale sellers or sold directly to customer-users. Two of Buccafusco’s biggest customers were Salvatore and Richard Romano. The Romanos were Brooklyn-based distributors who often obtained cocaine through Giammarino or through James Hansen, a Buccafusco employee. The Romanos engaged the services of two police officers, defendants Philip Leggio and Frank Caputo, who provided the Romanos with information regarding possible surveillance of the Romanos’ illegal activities.
The sales conducted by Buccafusco, Tranquillino, Giammarino and the Romanos allegedly took place in a regular, organized fashion. According to the People, all transactions were consistently recorded in handwritten ledger books and/or computer records which were exclusively maintained by the three major participants — Buccafusco, Giammarino and Tranquillino. The details of the sales, the quantity of cocaine distributed, and the customers’ names were entered in the ledger books and computers in a prearranged code.
It is alleged that defendant Michael Macklowitz, an attorney and former Kings County Assistant District Attorney, was one of Jack Buccafusco’s steady customers from November 1984 until March 12, 1986, the day of Buccafusco’s arrest. Macklowitz allegedly purchased between one half a gram to one-quarter ounce or more of cocaine on numerous occasions using the code name "Duane” (or "Dwayne” and "Dwane”).
The evidence against the defendant was presented to the Grand Jury through the testimony of accomplice Giammarino (who testified as to the day-to-day workings of the Buccafusco organization), and through the ledger books, computer records and intercepted telephone conversations.
CONSPIRACY
(a) CONTENTIONS OF THE PARTIES
Michael Macklowitz is charged with conspiracy in the *235 fourth degree. The People claim that defendant, with the intent that conduct constituting the crime of criminal possession of a controlled substance in the fourth degree be performed, agreed with Jack Buccafusco and others to engage in or cause the performance of such conduct. The prosecutor argues that sufficient proof was presented to the Grand Jury in the form of ledger books, computer records, telephone conversations and accomplice testimony to show that defendant entered into an agreement with Jack Buccafusco and others, the object of which was the possession of one-eighth ounce or more of cocaine.
Defendant claims that, at best, the evidence presented to the Grand Jury shows that Macklowitz was an occasional purchaser and user of cocaine. It is defendant’s position that the individual discreet "buys”, if they occurred at all, do not establish the requisite shared intent and agreement between defendant and the various codefendants to engage in an ongoing course of criminal conduct.[1]
(b) LAW OF CONSPIRACY
Penal Law § 105.10 states that a person is guilty of conspiracy in the fourth degree when, with intent that conduct constituting a class B or class C felony be performed, he agrees with one or more persons to engage in or cause a performance of said conduct and when an overt act is alleged and proved to have been committed by one of the conspirators in furtherance of the conspiracy.
New York embraces the unilateral approach to conspiracy. That is, the focus is upon individual rather than collective liability; the guilt of a particular party is considered independent of that of his coconspirators. (People v Schwimmer, 66 AD2d 91 [2d Dept 1978], affd 47 NY2d 1004.) Thus, even if a defendant’s sole coconspirator is legally irresponsible or has feigned agreement, defendant’s conviction will stand provided the evidence is otherwise legally sufficient.
The gravamen of conspiracy and an essential element thereof is the agreement to engage in some other substantive *236 crime. (People v Schwimmer, supra, at 95; People v Treuber, 64 NY2d 817, 818; People v Ozarowski, 38 NY2d 481.) The aim is to prevent the commission of the substantive crime by punishing the firm plan to commit it.
The degree of conspiratorial liability hinges upon the seriousness of the object crime sought to be committed. A closely related factor bearing on liability is the scope of the conspiracy — whether a particular defendant can be charged with knowing and joining a criminal enterprise. (Marcus, Prosecution and Defense of Criminal Conspiracy Cases § 4.01 [1986]; United States v Sisca, 503 F2d 1337 [2d Cir 1974], cert denied 419 US 1008.) If sufficient evidence of defendant’s knowledge exists, the question then arises whether there is a single indivisible conspiracy with multiple goals (for example, one conspiracy to violate several different statutes), or whether there are distinct multiple conspiracies. (Braverman v United States, 317 US 49 [1942].)
Numerous labels have been used in an effort to categorize different types of conspiracies. Chains, links, wheels, hubs and spokes are just a few of the terms utilized where there are several layers of actors involved.with various, albeit related, roles and objectives. The most common distinction made is between wheel conspiracies and chain conspiracies. A wheel conspiracy involves an individual (or small group) — the hub, who transacts illegal dealings with the various other individuals — the spokes. The most common evidentiary issue in a wheel conspiracy is whether the separate transactions between the hub and individual spokes can be merged to form a single conspiracy. (Marcus, op. cit. § 4.02 [2].)
In contrast, the chain conspiracy usually involves several layers of personnel dealing with a single subject matter, as opposed to a specific person. Drug trafficking is often cited as a classic example of a chain conspiracy inasmuch as it is characterized by manufacturing links, wholesaling links and retailing links. (United States v Bruno, 105 F2d 921 [2d Cir 1939], revd on other grounds 308 US 287.) A single conspiracy can be proven if each link knew or must have known of the other links in the chain, and if each defendant intended to join and aid the larger enterprise. (Marcus, op. cit.; Kotteakos v United States, 328 US 750 [1946]; Blumenthal v United States, 332 US 539 [1947].) The chain theory of conspiracy has been recognized by New York State courts in a drug distribution case (People v Parker, 124 Misc 2d 772), and in a stolen property fencing scheme. (People v Kiszenik, 113 Misc 2d 462.)
*237 This structural analysis is not without confusion, as some conspiracies may be classified as chain/spoke combinations. For example, in narcotics trafficking, the links at either end might be comprised of a number of persons "who may have no reason to know that others are performing a role similar to theirs — in other words the extreme links of a chain conspiracy may have elements of the spoke conspiracy”. (United States v Borelli, 336 F2d 376, 383 [2d Cir 1964], cert denied sub nom. Mogavero v United States, 379 US 960.)
Perhaps a more accurate way to visualize a complex conspiracy case would be to view it as a three-dimensional organic chemistry molecule with each part interacting continuously with another thereby forming and adhering to the whole, for a common purpose.
The People advance two basic arguments to support the conspiracy charge: (1) they argue that the crime of possession does not require reciprocal cooperation and therefore is not barred from serving as the object crime in a conspiracy count and (2) they claim that the chain theory of conspiracy may be applied to sustain the charge.
The People cite People v Jewsbury (115 AD2d 341 [4th Dept 1985]) and People v Potwora (44 AD2d 207 [4th Dept 1974]) as authority for their position. In Jewsbury the court sustained the conspiracy count (Penal Law § 105.10) against defendant seller where the object crimes were criminal sale of a controlled substance in the third degree and criminal possession of a controlled substance in the third degree (possession with intent to sell). In Potwora, defendant, a wholesale book distributor, was charged with conspiracy in the third degree and with the substantive crimes of obscenity in the first and second degrees.[2] The indictment was predicated on defendant’s sale and distribution of several pornographic publications to two retail book sellers who sold the material to a detective. Defendant in Potwora argued that the conspiracy count was defective inasmuch as the substantive crimes involved the mutual cooperation of the wholesaler and retailers and such cooperation similarly served as the foundation for the conspiracy count.
*238 The Fourth Department rejected this argument and upheld the conspiracy charge, stating that where concert between two people is not an element of the object crime a conspiracy count is proper. The court observed that, with respect to obscenity in the first and second degrees, the defendant may be found guilty for his individual, singular conduct of knowingly possessing obscene materials totally separate from concert with coconspirators. Potwora distinguished those cases involving bribery and unlawful sale of liquor, where a conspiracy charge would not ordinarily lie in addition to the substantive offense, because concert between the giver and receiver or buyer and seller is an essential element of the object crime. (People v Potwora, supra, at 211, n 1, citing United States v Sager, 49 F2d 725, 727 [2d Cir 1931], and United States v Katz, 271 US 354.)
The People argue that Potwora (supra) supports the charge of conspiracy to possess one eighth of an ounce or more of cocaine against Macklowitz. They reason that if the Appellate Division found that a wholesaler’s distribution of pornographic materials to his retailer purchasers could give rise to a charge of conspiracy to commit obscenity in the first and second degrees on the ground that those crimes do not necessarily involve the concerted action of such individuals, then there is no legal impediment to charging a buyer with conspiring with his seller to commit the crime of criminal possession of a controlled substance in the fourth degree because such possession never requires any concerted action. The prosecutor contends that whenever there is a sale of cocaine, both buyer and seller become liable for conspiracy to possess the drug because mutual cooperation is not theoretically necessary to commit the crime of possession.
While the People’s argument has surface appeal, it does not withstand scrutiny under the facts of this case. Initially, I note that both Jewsbury (supra) and Potwora (supra) are easily distinguishable. In Jewsbury, the buyer was not charged with conspiracy as he is here (there, the defendant was the sellér), and the object crime was not naked possession but rather, was possession with intent to sell. Similarly, in Potwora, the defendant was a wholesale distributor of pornography and the charges were based upon possession of obscene materials with intent to distribute. In contrast, the evidence before the Grand Jury indicates that Macklowitz is, at most, an individual purchaser with no further criminal objective. Even accepting the People’s tenuous theory that the substantive object crime *239 of possession of narcotics does not necessarily require reciprocal actions of the buyer and seller, that does not alone ratify the conspiracy count. It is axiomatic that conspiracy requires common agreement and intent to join with others to commit a substantive crime (People v Schwimmer, supra, at 95). As noted by the Supreme Court, the record must be examined for evidence of such intent with special care in a conspiracy case for "charges of conspiracy are not to be made out by piling inference upon inference, thus fashioning * * * a dragnet to draw in all substantive crimes” (Direct Sales Co. v United States, 319 US 703, 711 [1943]; Ingram v United States, 360 US 672, 680 [1959]; People v Ozarowski, 38 NY2d 481, supra).
In my view, legally sufficient evidence has not been presented to the Grand Jury to indicate that Macklowitz entered into an agreement with coconspirators Jack Buccafusco, Michael Giammarino and Angelo Tranquillino intending to join the larger criminal enterprise. The evidence, if accepted as true, merely shows that on several occasions Macklowitz purchased cocaine from Buccafusco or Giammarino. The People have not introduced sufficient evidence from which it may logically be inferred that Macklowitz intended or agreed to do anything other than buy and possess cocaine for his own use.
I hold that the ultimate purchaser of cocaine cannot be drawn into the web of a conspiracy when the only evidence submitted to the Grand Jury is that on several occasions he bought cocaine for his own use.
The People have cited no authority to the contrary and, indeed, research has failed to uncover a single case where a conspiracy charge has, as its sole foundation, the mere possession of the buyer-user.
Application of the chain theory of conspiracy is of no avail. The People argue that Macklowitz knew or had reason to know that Buccafusco had suppliers and that he had other customers. They claim that all of those individuals shared the intent to possess at least one eighth of an ounce of cocaine[3] and entered into an agreement with Buccafusco, one of the objects of which was the possession of such cocaine.
Simply stated, there comes a point where the conspiracy ends. The People attach significance to the fact that here the evidence established a long-term, routinized arrangement *240 which enabled defendant to purchase cocaine under the code name "Duane” on a regular confidential basis. This does not alter the fact that there was no evidence presented from which the Grand Jury could reasonably conclude that Macklowitz intended to do more than merely possess the cocaine. Indeed, an ultimate purchaser may expect his supplier to provide the drugs, and may take advantage of the drugs’ availability on numerous occasions. These factors do not automatically demonstrate that the buyer conspired to bring about that result, and do not render the buyer a coconspirator of the seller. A narcotic conspiracy may begin in the cocaine fields of Peru, continue through processing, transporting, cutting, packaging, wholesaling and retailing. But such an enterprise ends with the person who last obtained it with intent to sell. The ultimate user is not part of this conspiracy.
If the People’s argument is to be accepted then every street user becomes a coconspirator with the seller. The prosecutor has made the criminal act itself (sale) as an overt act in the conspiracy (possession). This they cannot do. While the purchase and the sale necessarily involve possession, the ultimate goal of the buyer is to possess while the aim of the seller is to dispossess. The buyer of bootleg whiskey for his own use is not a coconspirator of the seller. (United States v Katz, supra.) Nor is the buyer of drugs molecularly bonded with the purveyor.
I find that the evidence presented to the Grand Jury, if accepted as true, shows no more than a series of cocaine purchases by Michael Macklowitz. That is not legally sufficient to sustain a charge of conspiracy with his suppliers. Accordingly, defendant’s motion to dismiss that count of the indictment is granted.
POSSESSORY COUNTS
(a) CONTENTIONS OF THE PARTIES
Defendant argues that the evidence before the Grand Jury was legally insufficient to support the 10 possessory offenses since there was no direct evidence that Macklowitz, using the code name "Duane”, possessed or attempted to possess the amounts of cocaine on the dates charged. Defendant further claims that the computer records and ledger books seized from the codefendants and accomplice Giammarino cannot satisfy the legal requirement of corroboration under CPL 60.22. He argues that since the records were generated by Giammarino *241 and derive meaning and significance from him, they merely bootstrap and do not corroborate the accomplice testimony.
• In contrast, the People contend that the possessory counts with which Macklowitz is charged are supported by at least two forms of evidence (in addition to the testimony of accomplice Giammarino) — either ledger books and computer entries, intercepted conversations and ledger entries or computer records and conversations. They further claim that, despite their origin, given their nature and quality, the records do constitute independent corroborative evidence within the meaning of CPL 60.22 and, at a minimum, establish a legally sufficient case against Macklowitz.
(b) DESCRIPTION OF LEDGER BOOKS AND COMPUTER RECORDS
The People introduced two handwritten ledger books before the Grand Jury. One book, seized from Buccafusco’s residence, reflects transactions which occurred at the end of September 1985 through December 1985. The second book, seized from Giammarino’s office, covers alleged sales made during the latter part of December 1985 to March 12, 1986, the date of Giammarino’s arrest. It is apparent from the handwriting that the entries in both books were made by the same person (Giammarino). The books contain seemingly innocuous entries with words such as "Box”, "Bel” (or "Bell”), "Panel”, "Siren”, etc. According to the undercover agent and Giammarino, the pages in reality reflect cocaine sales. In this regard, Giammarino testified that he obtained drugs either directly from Buccafusco or from Angelo Tranquillino, waited for Buccafusco’s customers to call on him, sold the drugs, and then recorded the amounts sold and payments made in the ledger books. The ledgers would be taken on a regular basis back to Buccafusco. The only time an entry was made was when Giammarino actually delivered cocaine to a customer, or when Giammarino would prepare a package for Buccafusco or Tranquillino and they would make the transfer to the customer, or on the rare occasion when Buccafusco or Tranquillino would simply tell Giammarino to log in a sale which had transpired. All entries (both customers’ names and amounts of cocaine) were recorded in code created by Buccafusco or Tranquillino. According to Giammarino, the code name "Duane” belonged to the defendant.
Examination of the ledger books shows that each page *242 contains columns denoting the date, the customer’s initials or code name, a code word reflecting the amount of cocaine that the customer purchased, whether the customer paid any. money and the amount of money paid. A number indicating the number of grams of cocaine distributed on a particular day is shown as a circled number next to the date. After several days, the total amount of drugs disbursed during that period is reflected; that number (referred to as the "amt used”) would be noted along with the amount that was available at the beginning of the period (the "start amount”), in addition to the amount added during that period. With the inception of each new time period, the remaining amount of cocaine would be weighed and that actual grand total ("agt”) would be used as the start amount for that new time frame. According to the People, the ledger entries, made contemporaneously with the actual transactions, represent a running inventory of the Buccafusco drug enterprise.
The People also introduced two types of computer records. The first set, denoted "actual printouts”, reflects printouts seized from Buccafusco’s house. The second set were records generated by the FBI from computer discs also seized from Buccafusco (denoted "FBI printouts”). According to Giammarino, Buccafusco began entering information contained on the ledger sheets into the computer and destroyed the ledgers. Each printout allegedly reflects the transactions of a particular customer. Thus, the computer records served essentially the same purpose as the ledger books. The records are comprised of three columns — date, transfer, and balance. A comparison of the computer records for an individual with the ledger book entries for that person reveals that the amount of cocaine transferred on a particular day, payments made by the customer, and amounts owed to the organization were uniformly and consistently chronicled.
With regard to defendant Macklowitz, the Grand Jury examined both actual and FBI-generated computer records. The former printout covers alleged purchases made between April 12, 1985 and December 31, 1985, and is denoted (in handwriting) "Mike M”. The latter printout reflects alleged purchases made between October 30, 1984 and February 18, 1986 and is labeled "MIM”. As to the overlapping time period, the entries in the records are identical. The notations in the ledger books under the name "Duane” similarly correspond to the computer records of "Mike M” and "MIM” regarding the *243 amount of cocaine purportedly purchased on a particular day, the payment, and the amount of money outstanding.
Thus, the ostensibly innocent entries are, according to the People, a detailed methodical illustration of the breadth of Buccafusco’s cocaine trade. Do such records constitute corroborative evidence of Giammarino’s testimony within the meaning of CPL 60.22?
(c) ACCOMPLICE CORROBORATION RULE
At common law there was no absolute bar to convictions resting solely on the testimony of an accomplice. Juries were merely cautioned or advised not to convict absent confirmation as to material facts. (People v Ramos, 68 AD2d 748, 751 [2d Dept 1979].) Since 1881, however, there has existed a statutory prohibition of convictions standing on the uncorroborated testimony of an accomplice. (Code Crim Pro § 399; People v Ramos, supra.)
The present version of the accomplice corroboration rule is embodied in CPL 60.22 (1) which states: "A defendant may not be convicted of any offense upon the testimony of an accomplice unsupported by corroborative evidence tending to connect the defendant with the commission of such offense.” Similarly, CPL 190.65 (1) provides: "a grand jury may indict a person for an offense when (a) the evidence before it is legally sufficient to establish that such person committed such offense provided, however, such evidence is not legally sufficient when corroboration that would be required, as a matter of law, to sustain a conviction for such offense is absent, and (b) competent and admissible evidence before it provides reasonable cause to believe that such person committed such offense.” (Emphasis added.)
The rule recognizes that an accomplice may proffer his testimony to implicate others in exchange for favorable treatment by the prosecutor. Such evidence thus lacks that degree of reliability usually associated with the testimony of a disinterested witness. CPL 60.22 insures fairness to a defendant by requiring that the testimony of the accomplice be supported by other proof if a conviction is to be had. (People v Daniels, 37 NY2d 624, 629; People v Dixon, 231 NY 111, 116; People v Duncan, 46 NY2d 74, 79; People v Berger, 52 NY2d 214, 218.) As the Court of Appeals observed, the objective of the statute is "not to require bolstering of the testimony of the accomplice * * * or to lend credibility to the details of his testimony; *244 rather the purpose of the statute is to protect the defendant against the risk of a motivated fabrication, to insist on proof other than that alone which originates from a possibly unreliable or self-interested accomplice” (People v Hudson, 51 NY2d 233, 238).
In order to satisfy the command of CPL 60.22, a two-pronged test must be met. First, the corroborative evidence must "tend * * * to connect the defendant with the commission of [the crime]”. In interpreting the "tending to connect” standard, the Court of Appeals stated that the corroborative evidence need only connect the defendant to the crime so as reasonably to satisfy the jury that the accomplice is telling the truth. (People v Donovan, 59 NY2d 834, 836; People v Tillotson, 63 NY2d 731, 733.) The corroborative evidence need not itself prove the commission of the crime. (People v Glasper, 52 NY2d 970.) Secondly, the corroborative evidence must be truly independent; the probative value of such evidence cannot be derived from the accomplice’s, testimony. "[R]eliance may not to any extent be placed on testimony of the accomplice for to do so would be to rely on a bootstrap.” (People v Hudson, supra, at 238.) Thus, in order to serve as corroborative evidence within the meaning of the statute, the evidence must stand on its own. Were the accomplice relied on to impart meaning to the proffered evidence, that would effectively vitiate its independent character and defeat the statute’s objective.
Research has failed to yield a single precedent where accomplice-generated records were offered as corroborative evidence of the accomplice’s testimony. In a related context, the Court of Appeals held that records of a criminal enterprise may be admissible as business records, provided that the foundation mandated by CPLR 4518 has been established. In People v Kennedy (68 NY2d 569) the court held that, in a conspiracy and usury, prosecution, the pocket diaries of a loanshark (reflecting the names of victims and payments) were inadmissible since it was not shown that it was in the regular course of business to keep such diaries. Yet, in light of Kennedy, the ledger books and computer records at issue here do constitute business records even though they were maintained by a criminal enterprise, since a proper foundation for their admission was laid (i.e., it was demonstrated that the entries were reported in a regular, methodical manner in the regular course of Buccafusco’s business, and that it was in the regular course of his business to make such entries).
*245 Thus, the ledger books and computer records qualify as business records and are admissible as evidence. That still does not address the issue of the evidentiary value of such records within the purview of CPL 60.22. Defendant Macklowitz’s argument that accomplice-generated records cannot, by virtue of their genesis, be treated independently of the accomplice’s testimony for the purposes of corroboration is correct. In this regard, the First Department has held that business records prepared by bookkeepers at the direction of accomplices require corroboration. (People v Felber, 264 App Div 181 [1st Dept 1942].) Clearly, if the sum total of evidence presented to the Grand Jury against Macklowitz were Giammarino’s testimony and records prepared by Giammarino, then the records, although admissible, would not suffice to corroborate the accomplice.
However, additional evidence was put before the Grand Jury which imparts meaning to the records and demonstrates their reliability (vis-á-vis Macklowitz making purchases as "Duane”), separate and apart from the testimony of the accomplice and the records he generated. That evidence essentially took two forms — intercepted telephone conversations and undercover purchases and surveillance.
The most significant series of phone calls were placed on February 25, 1986. In the first call (placed approximately 5:20 p.m.), Macklowitz called Buccafusco leaving a message on the latter’s answering machine. Sometime later (6:50 p.m.) the defendant called Giammarino, identified himself as "Mike Mack” and asked whether he could stop by Giammarino’s house at about 7:45 p.m. Buccafusco subsequently called Macklowitz’s home at about 8:15 p.m. and spoke to Macklowitz’s wife. Macklowitz told Buccafusco that the defendant had not yet arrived home. Approximately three minutes later, Buccafusco called Giammarino. Giammarino told Buccafusco: "Ah, Mr. * * * was here * * * Duane”. Buccafusco replied: "Duane * * * oh Duane is there?” Giammarino responded: "No, he was here. He left.” Buccafusco then stated: "Oh no wonder, I just called his wife.” Giammarino then told Buccafusco that "Duane” left Giammarino’s house approximately 15 minutes earlier.
This series of phone calls tend to establish that defendant Macklowitz was known to Giammarino as "Duane” and that he denoted Macklowitz as "Duane” in the ledger books. Moreover, the direct correspondence between the ledger book en *246 tries of "Duane” and computer records of "MIM” and "Mike M” also tends to confirm that the defendant purchased cocaine in the manner and amounts described by Giammarino. The records thus corroborate Giammarino’s testimony that defendant and "Duane” are one and the same; yet, in light of the phone calls, the records do not depend on Giammarino’s testimony for their interpretation.
Surveillances and purchases by the undercover special agent similarly give meaning to the records distinct from Giammarino’s testimony, thereby allowing the records to serve as corroborative evidence. Specifically, the documentary evidence directly corresponds to transactions consummated between the agent and Buccafusco’s long-time customers, Salvatore and Richard Romano. For example, the evidence presented to the Grand Jury for September 30, 1985 indicates that the agent purchased two packages of cocaine from the Romanos. He placed the order for the first package (12 ounces) with Sal Romano. Pen register tapes and billing records showed that the Romanos contacted Giammarino to fill the order. When the agent went to pick up the drugs, Sal told him that his son Richard was en route from the supplier. Richard arrived with the 12 ounces of cocaine, for which the agent paid $17,400. The undercover then arranged to purchase an additional 14 ounces later that evening. Upon arriving at the Romano house on this second occasion, Sal Romano told the agent that his son went to Staten Island to pick up the drugs. Telephone records indicate that Sal notified Giammarino of his need for the 14 ounces of cocaine. Some hours later the agent was given the drugs from the Romanos for $20,300. The ledger book entries for September 30, 1985 correspond identically to the Romanos’ sales to the undercover. The first entry for Richard Romano, denoted "RR”, shows that Richard received "12 PAN CK #336” or, as was demonstrated by the first transaction, 12 ounces of cocaine, or 336 grams (based upon 28 grams per ounce). The second entry for "RR” shows that Romano received "14 PAN CK #392”, or 14 ounces of cocaine (totaling 392 grams). The entry for the following day shows that Sal made a payment of $37,000 to the record keeper. On October 2 the ledger entry shows that $37,000 was "PO” or paid out to "JB” (Jack Buccafusco).
Thus, the ledger entries for the Romanos accurately correspond to the cocaine transactions between them and the undercover agent. There is similar correspondence between the computer record entries and the Romanos’ sales to the under *247 cover.[4] In addition, there exist both intercepted telephone conversations and corresponding ledger book entries of purchases by the Romanos on six separate occasions between December 1985 and March 1986. Therefore, I find that, given the sales to the undercover and the conversations, the entries are explicable as records of cocaine transactions in particular quantities, wholly independent of Giammarino’s testimony. Stated otherwise, the undercover’s dealings with the Romanos, and the precise documentation of these events in the records both impart meaning to the records and corroborate Giammarino’s testimony that defendant purchased certain quantities of drugs using the code name "Duane”, and that those transactions were likewise transcribed.
Finally, I find that the accomplice’s testimony was independently corroborated by a series of index cards seized from Giammarino’s office. The index cards, capable of interpretation independent of Giammarino, contain numbers reflecting commonly distributed weights of cocaine (i.e., one card contains the number 28 along side the number 1, obviously meaning that 28 grams is equivalent to 1 ounce; 7 along side the number one quarter, meaning that 7 grams equals one-quarter ounce, etc.). The cards also denote code names corresponding to notations in the ledger books (i.e., "RR” is listed next to two telephone numbers — one is Sal and Richard Romanos’ home telephone number, the other is Richard’s apartment telephone number). Significantly, one of the cards contains the code name "Duane” next to which is defendant Macklowitz’s home phone number, and next to that is the word, "Mack”. This direct link between defendant and "Duane” in the context of the Buccafusco operation is manifest and cannot be ignored.
In sum, I find that the confluence of factors — the telephone calls between Jack Buccafusco, Michael Giammarino and defendant Macklowitz where Macklowitz is referred to as "Duane”, the undercover’s purchases from the Romanos and the accurate documentation of those sales in the records, and the interrelationship between the computer records of "MIM” and "Mike M” and the ledger book entries of "Duane”— corroborate the accomplice’s testimony and tend to connect the defendant to the possessory crimes with which he is *248 charged. The ledger books and computer records, although prepared by Giammarino at the behest of the codefendants, do not depend on him for their interpretation. Accordingly, I find that the dictates of the accomplice corroboration statute are satisfied. Defendant’s motion to dismiss the possessory counts is denied.

. Defendant was initially charged also with conspiracy in the third degree; conspiracy to sell as well as conspiracy to possess. The People conceded that they could not establish the requisite selling intent of Macklowitz and have abandoned that allegation, thereby eliminating any problem of possible duplicitous pleading.

. Penal Law former § 235.06 states that a person is guilty of obscenity in the first degree when he wholesale promotes, or possesses with intent to wholesale promote any obscene material. Penal Law former § 235.05 provides that a person is guilty of obscenity in the second degree when he promotes or possesses with intent to promote any obscene material.

. It should be noted that virtually all of the substantive possession counts against defendant involve weights of less than one eighth of an ounce of cocaine.

. I note that for Buccafusco’s other customers, correspondence between ledger book entries and computer records also exists. Moreover, on many occasions intercepted telephone conversations and/or surveillance similarly confirmed that sales denoted in these records in fact took place.